### SIEBERT v. HALL et al.

### In re CONSUMERS' UTILITY CO.

#### No. 9526.

Circuit Court of Appeals, Eighth Circuit.

Feb. 3, 1933.

P. A. Lasley, of Little Rock, Ark. (H. M. Trieber, of Little Rock, Ark., on the brief), for appellant.

Harry E. Meek, of Little Rock, Ark. (W. E. Brownback, of St. Louis, Mo., and C. H. Moses and J. W. House, both of Little Rock, Ark., on the brief), for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

GARDNER, Circuit Judge.

This is a suit brought by Sydnor Hall and W. E. Brownback, as trustees, against the People's Public Service Company and the Consumers' Utility Company, both corporations, to foreclose a deed of trust executed by the Consumers' Utility Company to them as trustees for the Southeast Company, a corpo-

ration, securing the payment of a note for $75,000, executed by the Consumers' Utility Company and the People's Public Service Company. The note bears date July 1, 1930, while the trust deed is dated July 28, 1930. The People's Public Service Company is a holding company, owning all of the stock of the Consumers' Utility Company. Subsequent to the commencement of the foreclosure suit, and after the defendants had filed answer, the Consumers' Utility Company was adjudged bankrupt, and the appellant, V. H. Siebert, as trustee in bankruptcy of that company, was, by order of court, permitted to intervene and become a party defendant.

It is alleged in the complaint that the promissory note for $75,000 was given to evidence indebtedness from the makers to the payee, on account of advances made, services rendered, debts assumed, and indebtedness incurred. Then follow certain items of alleged expenditures and statement of services, which may be summarized as (1) money advanced on May 26, 1930, in connection with purchase of Sheridan properties, $40,875; (2) cash advanced June 4, 1930, to joint makers of note, $5,000; (3) charges for services in appraising and inspecting properties, and other expenses of loan, including compensation for services in settlement of controversy with holders of first mortgage, etc., $3,000; (4) principal and accrued interest on prior deed of trust assumed by the Southeast Company, $23,661.48; (5) cash advanced July 11, 1930, to joint makers of note, $2,463.52, making an aggregate amount of $75,000.

Appellant, in his answer, denies that the payee of the note made any advances to, assumed any debts of, or incurred indebtedness chargeable to, either of the makers of the note by way of any services in appraising or inspecting properties, or of any expenses of loan, or of services in settlement of controversy with holders of first mortgage; denies that any services were performed, or that the services performed were worth $3,000, or any other amount. The effect of the denial puts in issue the allegations of the bill of complaint, but it is alleged that "the Southeast Company assumed, but has not in whole or in part, paid the sum of $23,661.48 on account of said prior mortgage, and is not entitled to recover the same." The answer then alleges that the note and the deed of trust securing same are void, "in that by each thereof a greater sum of value for the loan or forbearance of money than 10 per cent per annum was reserved, taken, secured

or agreed to be taken or reserved." Other allegations of the answer are not material to the issues presented.

The trust deed covers electric light, telephone, and water systems in Arkansas, belonging to the Consumers' Utility Company. The note became due six months after its date, and in default of payment this suit to foreclose was commenced. The Southeast Company owns utility plants in Alabama and Arkansas.

The trial court found that the transaction was not tainted with usury and entered judgment for foreclosure of the deed of trust, and from the decree so entered the trustee in bankruptcy, after severance, has taken this appeal.

The substantial, if not the only, issue involved in this case is whether the plea of usury was established by a preponderance of the evidence. This plea is based upon two contentions: (1) That the $3,000 item, purporting to be for services, was in the nature of a disguise or shift to hide usury; (2) that the undertaking of the Southeast Company to secure releases of the first mortgage indebtedness was usurious because said indebtedness was not presently paid, but withheld by the lender. To understand the contentions of the parties, it is necessary to consider certain negotiations had between them prior to the execution of the note in question.

In April 1930, E. T. Stanfield, president of defendants, Consumers' Utility Company and People's Public Service Company, had consulted one Moorhead, an investment banker, relative to refinancing the Consumers' Utility Company, but was advised by Moorhead that the company was too small to make public financing feasible, but suggested that Stanfield consult Sydnor Hall, president of the Southeast Company, relative to a merger with the last-named company, in which event financing might be effected. At that time the Consumers' Utility Company was indebted to two Chicago concerns in the sum of $22,000 and interest, this indebtedness being secured by a first deed of trust upon its property. In the meantime it had acquired an option to purchase a telephone system in Sheridan, Ark., which required a payment of $40,875 by June 1, 1930.

On May 20, 1930, Stanfield met Hall of the Southeast Company at St. Louis, Mo., and discussed the question of merger with him. At that meeting it was agreed that Hall and Moorhead would go to Little Rock, Ark., May 22, 1930, for the purpose of inspecting the properties of the Consumers' Utility Company. The Southeast Company, according to Hall's testimony, was in good financial condition, but he was willing to consider any expansion that might seem profitable. The three parties, Stanfield, Hall, and Moorhead, began an inspection of the properties, but Stanfield said that it would be useless to continue the inspection trip because his company had an option to purchase the telephone system at Sheridan, Ark., which would expire June 1st, and it was necessary for him to complete a loan that he was then negotiating so that his company might exercise the option. The inspection trip was therefore not completed, but the parties met at Little Rock, Ark., May 24, 1930, where they entered into a contract which reads, so far as here material, as follows:

"Pursuant with attempting to effect a merger of the People's Public Service Corporation, a Delaware corporation, which we will call party of the first part and which owns one hundred per cent (100%) of the Consumers' Utility Company, Inc., an Arkansas corporation, and the Southeast Company, a Delaware corporation, which we will call party of the second part.

"Party of the second part agrees to loan party of the first part seventy-two thousand ($72,000.00) dollars cash and to give services and other valuable considerations in exchange for which party of the second part will receive a note for seventy-five thousand ($75,000.00) dollars, bearing eight per cent interest and maturing December 31, 1930; same to be secured by a deed of trust embracing all of the properties now owned by the party of the first part and subsidiaries, which are represented as follows: [Then follows a description of the property.]

"In addition to the above, it is agreed that the party of the first part will pay all legal fees, both of party of first part's and party of the second part's, in connection with said properties and the execution of said deed of trust; party of the second part agrees that legal fees of party of second part will not exceed five hundred ($500.00) dollars and that said $500.00 will be waived in event a consolidation or agreement is reached and applied to the general cost of said agreement."

Stanfield testified that prior to entering into this contract he had told Hall that he was able to secure a loan of $75,000, maturing in two years, with interest at 8 per cent., plus a bonus, but that Hall suggested that such a loan would interfere with, if not prevent, the proposed merger, and he offered on behalf of

his own company to advance the money necessary to take care of the immediate demands of the Consumers' Utility Company, so that merger negotiations might continue.

On June 23, 1930, Hall and Stanfield met in Chicago, for the purpose of settling the indebtedness of the Consumers' Utility Company to the Chicago creditors, as provided in the contract. In negotiations with these creditors, it was agreed that Stanfield, in behalf of his company, would waive all damages against the creditors for breach of an alleged contract to lend his company more money, and that they in turn would waive certain expense items growing out of the loan which they claimed were chargeable to the debtor. These creditors agreed that, if they received on July 1, 1930, the accrued interest due them to that date, and $1,000 on principal, they would accept payment of the balance of $21,000 in installments of $1,000 a month, plus accrued interest. Hall testified that his company assumed the payment of these debts in the manner agreed, and that "the amount thus assumed was treated as a cash advance, to that extent, under the note." The Southeast Company has made payments on the debt of the Chicago creditors in various installments, aggregating $12,657.16. Hall, for his company, advanced $40,875 for the purchase of the Sheridan telephone property on the 26th of May, 1930, and the sum of $5,000 on June 4, 1930. The $75,000 note, the basis of the foreclosure in this suit, was sent to Stanfield for execution July 7, 1930, at which time only the sum of $2,661.48 had been paid to the Chicago creditors.

On June 16, 1930, Stanfield met Hall in Jackson, Miss., and from there they went to Tuskegee, Ala., to inspect properties of the Southeast Company. They intended to inspect other properties of the same company, but seem to have disagreed as to a value to be placed upon the Tuskegee property, and Stanfield says that from that time all idea of a merger was abandoned. It appears, however, that under date July 10, 1930, Stanfield wrote Hall, saying: "I appreciate the courtesy you have shown us very much and trust that we may have continued pleasant relations and finally be able to reach a mutually satisfactory agreement in the way of merger or consolidation of interests."

On August 14, 1930, Stanfield wrote Hall, advising that the stockholders of his company were unable to reach an agreement on any of the propositions made for the purchase of Hall's properties and "therefore will have to call any deal off on that basis." On December 6, 1930, he wrote Hall that he was "perfectly willing to go into another conference and discuss merger or outright sale." As late as August, 1930, Hall had an engineer of the Southeast Company inspecting and appraising the properties of the Consumers' Utility Company.

The $75,000 note was prepared in St. Louis, Mo., then sent to Little Rock, Ark., by mail, where it was signed and returned by mail to Hall at St. Louis. The note is payable in St. Louis, while the trust deed provides that it may be paid either in St. Louis, Mo., or Little Rock, Ark.

In Arkansas, the maximum rate of interest that may be reserved for a loan of money is 10 per cent. (Crawford and Moses' Digest of the Statutes of Arkansas, §§ 7353, 7354, 7362 and 7366). The penalty for exceeding the maximum interest rate, under the laws of Arkansas, is a forfeiture of both the principal and interest of the loan (Arkansas Constitution, art. 19, § 13).

In Missouri, the maximum rate of interest that may be contracted is 8 per cent. per annum; but the penalty for exceeding the maximum relates only to personal property security; it being provided that every mortgage or pledge of personal property, or any lien thereon, made for the purpose of securing a usurious debt, is void, but the debt is not void (sections 2840-2844, Revised Stat. Missouri, 1929 [Mo. St. Ann. §§ 2840-2844]).

It is apparent that, if the contract is usurious in Arkansas, it is also usurious in Missouri.

In view of the conclusion which we have reached in this case, it is not important to determine whether the consequences for entering into a usurious contract provided by the statute of Arkansas, or those provided by the laws of Missouri, should be applied.

The first contention of appellant is that the item of $3,000, mentioned in the contract for services, was a mere device or shift to hide usury. If this item of $3,000 was in fact not for services, but additional compensation for the loan of money, it would taint the transaction as usurious, and, as said by this court in E. C. Warner Co. v. W. B. Foshay Co., 57 F.(2d) 656, 659: "Courts, however, are not bound by what the parties represent themselves to be doing, but will look beyond the mere form of the transaction to its substance. Usury is a moral taint, and no subterfuge, however cunningly devised, will be permitted to conceal it. If it appears that the transaction as disclosed by the testimony

and the surrounding facts and circumstances was in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money, then, regardless of the forms or devices resorted to to conceal the character of the transaction, the parties thereto are subject to the consequences provided by the usury statutes."

Mr. Hall, who handled the transaction for his company, testified that this item of $3,000 was fixed upon by the parties in their negotiations preliminary to the execution of the contract of May 24, 1930, as a genuine and fair estimate of the expenses the proposed merger would entail, and that he was unwilling that his company should bear that expense. On this subject he testified: "A merger would have necessitated a very thorough inspection to determine the details, true value, and earnings of the properties, by finding out the total number of miles of line, the actual number of customers or accounts, the number of possible future customers, a complete report of physical condition, and the amount of money required to put the property in a first-class operating condition, and for improvements and expansions. Such an inspection would have required the time of engineers and an audit. This character of inspection would not have been necessary for a loan."

He is corroborated in this by the testimony of Mr. Brownback, attorney for the Southeast Company, who testified that he came to Little Rock to pass upon the agreement before it was executed; that he inquired into the matter of the $3,000 item, and after examination of both Hall and Stanfield concluded that it was not intended to be a cover for usury, but was a genuine service charge. True, Mr. Stanfield, corroborated by his two sons and a Mr. Kaup, secretary of his two companies, testified in effect that Hall, during the negotiations leading up to the signing of the contract, had reiterated that the $3,000 was nothing but an extra interest charge, "that a loan on the basis proposed by Hall was illegal," and that Hall boastfully asserted that "usury was continuously being covered up," and that this charge could be shown as a commission, and "that if there was any cream to let him have it." The trial court, however, on conflicting evidence, found the issue in favor of the plaintiff, and, while we are not precluded from considering the weight of the testimony, the conclusions of the trial court on issues of fact are presumptively correct. Hodges v. Meriwether (C. C. A. 8) 55 F.(2d) 29; Central Republic Bank & Trust Co. v. Caldwell (C. C. A. 8) 58 F.(2d) 721; Karn v. Andresen (C. C. A. 8) 60 F.(2d) 427; Lion Oil Refining Co. v. Albritton (C. C. A. 8) 21 F.(2d) 280.

The testimony with reference to what Hall is reputed to have said at the time of these negotiations is not impressive. It seems improbable that, if Hall had in mind collecting usury, he would be boasting about it to these comparative strangers. As said by the Supreme Court in Houghton v. Burden, 228 U. S. 161, 33 S. Ct. 491, 494, 57 L. Ed. 780: "The natural presumption is that Burden was endeavoring to put his contract in such shape that Canfield could not defeat his obligation by the defense of usury. Yet we are asked to believe that he deliberately declared to the debtor that the agreement as to services was a device to defeat the law, and that he was not to render any such service. The incredibility of such a declaration by Burden to Canfield, the debtor, seems obvious."

The burden of proof was upon the defendants. The Southeast Company was not primarily a money loaning concern, and in their inception the negotiations between the parties did not contemplate a loan, but a merger, and the loan was apparently an incident to the plan for a merger of the companies.

Services rendered may form, wholly or in part, the consideration for an obligation, and, if the obligation is taken in good faith and not as a device to hide usury, it is valid, even though the named compensation may be greater than usually paid for the services of a like kind. It is urged that the services actually rendered were not of the value of $3,000 nor of a value to exceed $750, but apparently some services were actually contemplated and performed, and, if there was a failure, or a partial failure, of consideration of that part of the contract, this would certainly not render the contract usurious. White Water Valley Canal Co. v. Vallette, 21 How. 414, 16 L. Ed. 154; Duden v. Maloy (C. C.) 43 F. 407.

To avoid a contract, usury must have existed at its inception. There must at that time have been an attempt to do something which is violative of the usury statute, and a contract not usurious when entered into cannot be made so by the subsequent acts of the parties. The fact that the services actually rendered were slight in value, as compared with the value placed upon them by the parties when the contract was made, while proper evidence on a charge that such an item

was part of a scheme to avoid usury, is entitled to but little weight. Houghton v. Burden, 228 U. S. 161, 33 S. Ct. 491, 57 L. Ed. 780; In re Canfield (C. C. A. 2) 193 F. 934, 938; Stein v. Swensen, 46 Minn. 360, 49 N. W. 55, 24 Am. St. Rep. 234; Gaither v. Farmers', etc., Bank, 1 Pet. 37, 7 L. Ed. 43; Nichols v. Fearson, 7 Pet. 103, 8 L. Ed. 623.

In Houghton v. Burden, supra, the court said: "Of course, if the service to be rendered should be made to appear trivial and of no real importance, the inference might be drawn that the agreement in that particular was a sham and device to cover a mere usurious contract."

The Circuit Court of Appeals in Re Canfield, supra, in the course of the opinion said:

"The fact that Burden did little work is not of especial importance.

"We are to test the contract as of the date of its inception and inquire what services he was required to do. If the business had run along for a year and he had complied with the condition he would have made examination of the books and assisted in making collections which would have taken a substantial amount of time and been worth a substantial compensation. The services were little because the failure came before the time of the first monthly 'complete examination of books, accounts and vouchers.'"

So, in the instant case, at the time of entering into this contract the parties had in mind a merger, and this purpose was not abandoned until some months subsequent to the signing of the contract and note. We conclude that the finding of the court that this item of $3,000 was not a mere sham or device for covering up usury should be sustained.

It remains to consider appellant's contention that, while the note included the whole $22,000 and interest due the Chicago creditors, this amount was not advanced at the time, but it was arranged to pay it off in monthly installments. As we view the contract of the parties, as modified subsequent to the date of their written contract, it in fact provided for three things: (1) The payment of $3,000 for certain services; (2) the assumption by the Southeast Company of the prior indebtedness against the property on which it was taking trust deed; and (3) the payment of cash. So far as the prior indebtedness was concerned, as between itself and the Consumers' Utility Company, it obligated itself to settle these claims. It might have done this by paying over the entire amount of the claims and interest to the defendants,

or it might have negotiated with the creditors and secured a compromise of the claims, and, if it had done the latter on a basis of 50 cents on the dollar, it would still have complied with its contract. It is clear that this part of the transaction did not constitute, within the contemplation of the usury laws, a loaning of money.

What rights or liabilities were created between creditors and the Southeast Company can scarcely be determined on this record, but its determination is not necessary. Certainly, there was no legal barrier to the Southeast Company becoming contractually liable to the owners of the debts secured by the first lien, but whether it did so or not is not important. If the Southeast Company agreed with the Consumers' Utility Company and the People's Public Service Company to liquidate this indebtedness, and became legally bound as between the parties to do so, there would be a sufficient consideration to support the contract. Fidelity & Deposit Co. v. Wheeler (C. C. A. 8) 34 F.(2d) 892. It would, in effect, be a promise to settle the debt, whether by installments or otherwise. In such a transaction no money was advanced to the makers of the note, and it was not contemplated that it should be. The law of usury applies only to loans of money, and the terms "interest" and "forbearance" cannot be applied to anything other than a loan of money. The purpose of the usury statutes is to prevent excessive charges for the use of money. They apply only to those transactions that in substance involve a loan of money or forbearance to collect money due, and, where there is no loan or forbearance, there can be no usury. Jordan v. Mitchell, 25 Ark. 258; Title Guaranty & Surety Co. v. Klein (C. C. A. 3) 178 F. 689, 29 L. R. A. (N. S.) 620.

No doubt the original contract between the parties contemplated that this $22,000 should be advanced in a lump sum, but in June, following the execution of this contract, arrangements were made for payment in installments. The note was made after this modification of the original contract. It is to be noted that there is no contention that there was any express agreement or intention in this part of the transaction to evade the usury statutes in thus making the note for the whole sum, although it was to be advanced in installments. The contention is, rather, that, because the note as made and the installments as paid bring the interest rate above the statutory maximum, the transaction thereby became tainted with usury.

The note discloses on its face no usurious

agreement. The only evidence of a corrupt agreement, so far as this part of the transaction is concerned, is that the note is for a larger sum than actually advanced at the time. In Bank of United States v. Waggener, 9 Pet. 378, 399, 9 L. Ed. 163, in an opinion by Mr. Justice Story, it is said: "Where, indeed, the contract, upon its very face, imports usury, as by an express reservation of more than legal interest, there is no room for presumption, for the intent is apparent; res ipsa loquitur. But where the contract on its face is for legal interest only, there it must be proved, that there was some corrupt agreement, or device or shift, to cover usury; and that it was in the full contemplation of the parties."

In Minneapolis Harvester Works v. Kaessner, 41 Neb. 716, 60 N. W. 8, the Supreme Court of Nebraska held that the execution of a note for a larger amount than is advanced is no evidence of usury, but shows that, pro tanto, the note was without consideration.

This part of the transaction was not a loan, but a contract by which the Southeast Company undertook and agreed, for a consideration, to secure settlement of certain debts secured by a lien upon the property of the Consumers' Utility Company, and there was no evidence indicating any intent to exact a usurious rate of interest.

The judgment appealed from is therefore affirmed.