**GENERAL MOTORS ACCEPTANCE COR-
PORATION v. MID–WEST
CHEVROLET CO.**
No. 807.

Circuit Court of Appeals, Tenth Circuit.
June 22, 1933.

**2**

Bruce McClelland, Jr., of Oklahoma City, Okl., and Anthony J. Russo, of New York City (Preston C. West and A. A. Davidson, both of Tulsa, Okl., and Pierce, McClelland, Kneeland & Bailey, of Oklahoma City, Okl., on the brief), for appellant.

C. B. Stuart and Philip N. Landa, both of Tulsa, Okl. (E. J. Doerner and Hal Crouch, both of Tulsa, Okl., and Merrill S. Bernard, of Sand Springs, Okl., on the brief), for appellee.

Villard· Martin, of Tulsa, Okl., amicus curiæ.

Before PHILLIPS and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The appellee recovered a judgment on the verdict of a jury for $377,718.00, in an action bottomed on the Oklahoma Usury Statute which provides that: "The taking, receiving, reserving or charging a greater rate of interest than is provided by the preceding section shall be deemed a forfeiture of twice the amount of interest which the note, bill or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case a greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover from the person, firm or corporation taking or receiving the same in an action in the nature of an action of debt twice the amount of the entire interest paid." O. S. 1931, § 9519.

The principal error assigned is that the trial court erred in refusing defendant's request to direct a verdict for that there was no substantial evidence of usury in the transactions complained of.

The petition alleges that in May, 1928, the parties entered into an oral contract by which the defendant agreed to loan to the plaintiff up to $500,000 a year during the ensuing four years, and the plaintiff agreed to deposit with the defendant, as collateral security, conditional sales contracts which the plaintiff might acquire from customers to whom it sold cars on time; that such contracts should be endorsed by the plaintiff unconditionally and with recourse, and that the plaintiff's liability thereon should be absolute; that the defendant furnished plaintiff the forms of the conditional sales contracts and notes to be used by the plaintiff in its dealings with the public, and the defendant prescribed the terms and rates of such contracts. That as further security for said loan, the plaintiff agreed to assign any funds that might be due it from the General Motors Corporation or any of its subsidiaries. That while from the face of

the papers executed it appears that a sale of such contracts was accomplished, the words used were mere shams and devices to cover loans of money at usurious rates of interest, and that from all of the acts and conduct of the parties, it appears that the relationship was that of debtor and creditor, and not of seller and buyer. It is alleged that the defendant did not notify the makers of said conditional sales contracts of the assignments from the plaintiff to the defendant; that the liability of the plaintiff upon its assignment was absolute and unconditional; that the absolute responsibility of collecting the amounts due from the makers at all times rested upon the plaintiff. It is alleged that during the four years in question the defendant acquired from the plaintiff contracts covering the conditional sale of about 4,000 automobiles, and that the difference between the face of said contracts and the amounts paid by the defendant to the plaintiff was the sum of $188,859.00; the prayer is to recover twice that sum.

In its answer, the defendant denied that any oral agreement was entered into, and denied that the conditional sales contracts were assigned to it as collateral security; on the contrary, it alleged that it purchased outright said conditional sales contracts for a valuable consideration, all in accordance with a printed plan under which the defendant conducted its business. That under such plan, the liability of the plaintiff under its guaranty was not absolute, but contingent; that the defendant did notify the makers of said conditional sales contracts of their assignment, and did undertake and make collections thereof from the makers.

 It may be well, at the outset, to resolve the dispute between the parties as to the nature of the action. The defendant asserts that the action is grounded upon the oral agreement which is alleged to have been made in 1928 between one Thompson, an officer of the plaintiff, and one Rhinehart, the manager of the defendant's branch at Oklahoma City. The defendant objected to the testimony as to this oral agreement upon the ground that there was no proof that a manager of one of the many branches of the defendant had any authority to alter or vary the terms of the written plan by which the defendant agreed to purchase paper from automobile dealers throughout the United States; and particularly that he had no authority to agree that the corporation would lend to the plaintiff, for a period of years, amounts up to $500,000 a year. The defendant further complains

that the trial court, although requested so to do, refused to instruct the jury that unless such authority was found to exist, there could be no recovery. If the existence of the oral contract testified to by Thompson, and vigorously denied by Rhinehart, is indispensable to plaintiff's case, the contentions of defendant are unanswerable. Rhinehart was the manager of but one of the many branch offices maintained by defendant in its operations throughout the United States; the defendant had formulated a plan, in minute detail, for the acquisition of conditional sales contracts owned by dealers in products of the General Motors Corporation; in pursuance of that plan, it established branch offices, with managers who were authorized to carry out the plan in a particular territory. There is no evidence whatever of the authority of the manager of the branch at Oklahoma City to depart from the plan he was employed to execute, and to engage in the business of lending the funds of the defendant. The law does not clothe a branch manager with such far-reaching authority. The point is not of vital importance, however, for if the oral contract does underlie plaintiff's case, and if it were proven by competent evidence, the question then must be answered as to whether or not any loans were made under that oral agreement; and that inquiry immediately plunges us into the real question in the case, and that is, whether or not the transactions which actually took place were sales of the contracts, as they purport to be, or whether the contracts in fact were pledged as collateral to secure a loan made in pursuance to the oral agreement alleged. To put it another way: If the transactions carried on during the years were in fact loans tainted with usury, the plaintiff may recover irrespective of any antecedent agreement to exact usury. On the other hand, if the transactions were what they purport to be, sales of contracts, then they were not pledged as collateral in pursuance of the alleged agreement, and the plaintiff may not recover in this action because of an agreement which was not carried out. In probing into the pivotal question of whether the transactions as carried out were sales of the contracts with a contingent guaranty, or loans secured by collateral, conversations between authorized representatives of the parties are admissible, as are other relevant circumstances.

The issue in this case is not what the parties agreed to do or not to do; the issue is whether the defendant exacted a greater rate of interest than that permitted by the Oklahoma statute. That issue in turn, breaks up

into two questions: (a) Were the transactions in fact loans of money by the defendant to the plaintiff, with the contracts pledged as collateral, or were they bona fide sales of paper? (b) If the transactions were in fact loans and not sales, was a greater rate of interest exacted than permitted by the Oklahoma statute?

The governing principles of law are not difficult nor seriously in dispute. While the usury statute is in derogation of common law, the Oklahoma Legislature has enacted that the statutes of Oklahoma in derogation of the common law "are to be liberally construed with a view to effect their objects and to promote justice." C. O. S. 1921, § 3563. The decisions of the Oklahoma. Supreme Court are in accord. Citizens' State Bank of Ft. Gibson v. Strahan et al., 63 Okl. 288, 165 P. 189; Dies v. Bank of Commerce of Sapulpa, 100 Okl. 205, 229 P. 474. The burden of proving usury is upon him who alleges it, and it must be established by clear and satisfactory evidence. Houghton v. Burden, 228 U. S. 161, 172, 33 S. Ct. 491, 57 L. Ed. 780; First National Bank v. Phares, 70 Okl. 255, 174 P. 519, 21 A. L. R. 793. The Oklahoma Supreme Court has held that: "In determining whether or not a contract, lawful upon its face, is usurious, and when two constructions of the transaction are possible, one for and the other against usury, the one against usury will always be adopted." Foreman v. Needles, 78 Okl. 105, 188 P. 1087, 1089.

Whether a transaction is tainted with usury is a question of fact, but like all other questions of fact, it is a question of law whether the proof discloses substantial evidence thereof. In determining the fact of usury, courts are not bound by the form which the transaction took; on the contrary, it is not only the right but the duty of the court to probe behind the written contracts, and to examine all facts and circumstances which shed any light upon the true nature of the transaction. Those who exact usury are generally familiar with the usury laws; they are astute in devising schemes for the purpose of concealing their exactions. Courts should be as astute in revealing the truth of the transaction.[1]

---

[1] Home Bond Co. v. McChesney, 239 U. S. 569, 36 S. Ct. 170, 60 L. Ed. 444; Le Sueur v. Manufacturers' Finance Co. (C. C. A. 6) 285 F. 490; Tennessee Finance Co. v. Thompson (C. C. A. 6) 278 F. 597; Petition of National Discount Co. (C. C. A. 6) 272 F. 570; Commercial Security Co. v. Holcombe (C. C. A. 5) 262 F. 657; National Trust & Credit Co. v. F. H. Orcutt & Son Co. (C. C. A. 7) 259 F. 830. These cases involve the use of subterfuges without refinement. The parties entered into written contracts by which they purported to sell accounts, either with

Before there can be usury, there must be a loan. Nichols v. Fearson, 7 Pet. 103, 109, or without security, the accounts to be left with the borrower and collected by him as the agent of the lender or through the intermediary of a third party paid by the borrower, the borrower agreeing to repurchase the accounts upon demand. In Re Grand Union Company (C. C. A. 2) 219 F. 353, the contract provided that the lender should pay a collection agent the sum of $25.00 per month, but the facts disclosed that such agent was paid by the borrower and not the lender. In Brierley v. Commercial Credit Co. (D. C. Pa.) 43 F.(2d) 724, the contract provided that the lender should perform certain services in connection with the transactions, but the court found as a fact that the services were not rendered, and that it was not contemplated that they should be rendered. In Missouri, K. & T. Trust Company v. Krumseig (C. C. A. 8) 77 F. 32, affirmed 172 U. S. 351, 19 S. Ct. 179, 43 L. Ed. 474, the subterfuge was embellished with a refinement to the effect that the borrower need not pay in case of his death. The court ascertained the value of insurance upon the life of the borrower and after deducting the cost thereof as a legitimate charge, found that the amount of the exaction applicable to interest was largely in excess of the statutory rate. In Missouri Valley Life Ins. Co. v. Kittle (C. C.) 2 F. 113, in addition to charging the maximum interest for a loan, the lender stipulated that the borrower must purchase a contract of insurance on his life, or the life of some other person; the court properly held the profit derived from this life insurance policy should be added to the interest exacted. In E. C. Warner Co. v. W. B. Foshay Co. (C. C. A. 8) 57 F.(2d) 656, a still more elaborate device was penetrated. There, as a condition of making a loan with a legal rate of interest, the lender required the borrower to purchase a piece of real estate at an exorbitant value.

On the other hand, in Houghton v. Burden, 228 U. S. 161, 33 S. Ct. 491, 57 L. Ed. 780, the lender stipulated that in addition to the interest prescribed for the loan, the borrower should pay him a compensation of 1 per cent per month for services which were required by an indemnity bond to be performed by the lender. The Supreme Court held that if the service to be rendered was trivial and of no importance, the inference might be drawn that the agreement therefor was a device to cover a usurious contract; but that in the particular case, the services were substantial, and did not taint the transaction with usury. The same thing was held by the Eighth Circuit Court of Appeals in Siebort v. Hall, 63 F.(2d) 517, where the agreement contemplated substantial services, although all of the services contemplated were not performed.

It has been held that where a lender renders services in collecting accounts assigned to him, he may exact a fair charge for such services in addition to legal interest. In re Mesibovsky (C. C. A. 2) 200 F. 562; In re Canfield (C. C. A. 2) 193 F. 934. The Oklahoma Supreme Court has held that if the borrower agrees to pay for services in preparing papers and inspecting property, a charge therefor does not render a transaction usurious. First National Bank v. Phares, 70 Okl. 255, 174 P. 519, 21 A. L. R. 793. In Low v. Sutherlin, Barry & Co. (C. C. A. 9) 35 F.(2d) 443, it was held that a charge for expenses incident to a bond issue could "in no possible view be regarded as an interest payment."

Particularly pertinent to the case at bar is Friedman v. Wisconsin Acceptance Corporation, 192 Wis. 58, 210 N. W. 831, 53 A. L. R. 758, where it was held that the purchaser of automobile paper may exact a charge in addition to the legal rate of interest for fire, theft, health and accident insurance, and for investigation of the risk.

The authorities cited, and others examined, justify the statement that a lender may exact a charge for services not usually performed by lenders, which he actually renders in good faith and not as a cloak for usury. In ascertaining the fact of good faith, the most significant circumstance is a comparison of the fair value of the services performed with the charge made therefor.

8 L. Ed. 623; Philadelphia Warehouse Co. v. Seeman (C. C. A. 2) 7 F.(2d) 999; Stark v. Bauer Cooperage Co. (C. C. A. 6) 3 F.(2d) 214; In re Bibbey (D. C. Minn.) 9 F.(2d) 944; Evans v. Rice, 96 Va. 50, 30 S. E. 463. A loan of money involves an absolute agreement to return the sum borrowed at a future time. In re Grand Union Co. (C. C. A. 2) 219 F. 353, 356. No usury can attach to a bona fide sale of property, tangible or intangible, even though it is accompanied by an agreement of the seller to indemnify the buyer against loss.[2]

■ From these rules of law, it will be seen that the controlling question is whether or not there was substantial evidence from which a jury might find that in the acquisition of the 4,000 conditional sales contracts herein involved, the defendant did not purchase them with a contingent guaranty of the plaintiff's, as it purported to do, but that in truth and fact the defendant was lending money to the plaintiff at usurious rates of interest, and that the whole series of transactions was but a device and a sham to conceal the usury and evade the law. In deciding that question, we agree with counsel for plaintiff that "it is not what the parties called the transaction that determines its nature, but its true meaning is gathered from all the facts and circumstances." It is proper, of course, to consider the fact that a witness for defendant referred to the moneys paid for these conditional sales contracts as moneys "advanced" to the plaintiff; it is proper for the jury to consider that the Oklahoma office of the defendant referred to a payment due the plaintiff when a customer anticipated payment on a contract, as sending a check "for the unearned interest and insurance," although the expression was harmless, or nearly so, when it is considered that the rebate is measured by the unearned interest and insurance paid by the customer. By the same token, it was proper for the jury to consider that the manager for the plaintiff in his correspondence through the years with the defendant, consistently referred to the transactions as a purchase and sale of paper, as he repeatedly did on the witness stand. It was also proper for the jury to consider the fact that the

books and financial statements of the plaintiff did not reflect the transactions as loans, as well as the explanation thereof. But when all is said and done, it still is true that the fundamental inquiry must be directed to the question of what actually took place between the parties, and not their characterizations of those transactions. We turn then to the undisputed facts of what happened. The plaintiff concedes that all of the transactions in suit were in pursuance of the "GMAC Plan."

■ Many years ago the defendant promulgated a plan by which it proposed to acquire from dealers in automobiles manufactured by the General Motors Corporation such conditional sales contracts as the dealer might desire to dispose of. When a dealer acquires automobiles from the manufacturer, they are his property; he may sell them for cash, or on such terms as he desires. If he sells upon terms, he may retain the paper or dispose of it to any one. If he desired to dispose of it to the defendant, however, he was required to procure a certain minimum down payment, and to provide certain definite terms for the payment of the balance. An elaborate schedule of such terms, for different automobiles and for different classes of customers, was an integral part of the plan. In addition, there was a territory charge, varying with the territory in which the automobile was sold. Although the record is not entirely clear, it is probable that such territory charge represented the cost of the insurance policy which was issued to the customer. The defendant prepared and provided all of the forms of contracts which were necessary. The conditional sales contract executed by the customer to the dealer provides that the deferred payments shall be payable at the office of the Acceptance Corporation, and retains the title in the dealer until full payment is made. It gives to the dealer the right to repossess and sell the property in case of default. Upon the completion of the transaction with the customer, the dealer certified to the genuineness of the transaction, after which is the following assignment, signed by the dealer:

"For value received, the undersigned does hereby sell, assign and transfer to the General Motors Acceptance Corporation his, its or their right, title and interest in and to the within contract and the property covered thereby and authorizes said General Motors Acceptance Corporation to do every act and thing necessary to collect and discharge the same.

---

[2] Nichols v. Fearson, 7 Pet. 103, 8 L. Ed. 623; Coast Finance Corp. v. Ira F. Powers Furniture Co., 105 Or. 339, 209 P. 614, 24 A. L. R. 855; General Motors Acceptance Corporation v. Weinrich, 218 Mo. App. 68, 262 S. W. 425; State Bank v. Northwestern Security Co., 159 Minn. 508, 199 N. W. 240; Martin v. McAvoy, 130 Wash. 641, 228 P. 694; Commercial Credit Co. v. Tarwater, 215 Ala. 123, 110 So. 39, 48 A. L. R. 1437. Many of the cases cited in Note 1 so state the rule.

"In consideration of your purchase of the within contract, the undersigned guarantees payment of the full amount remaining unpaid hereon, and covenants that if default be made in payment of any instalment herein to pay the full amount then unpaid to General Motors Acceptance Corporation upon demand, except as otherwise provided by the terms of the present General Motors Acceptance Corporation Retail Plan. The liability of the undersigned shall not be affected by any settlement, extension of credit, or variation of terms of the within contract effected with the purchaser or any other person interested. The undersigned waives notice of acceptance of this guaranty and notices of non-payment and non-performance."

The dealer then offered the paper to the defendant; the defendant investigated the risk, and accepted or rejected the offer. If it accepted, the defendant sent to the dealer the difference between the down payment made by the customer and the cash price of the automobile. The dealer thereby received, from the customer and the defendant, the cash price of the automobile. The defendant owned the paper, with the dealer's contingent guaranty.

Thereupon the defendant notified the customer that it had purchased his contract, and instructed him to make the payments thereon to it, and sent him a coupon book for his convenience in recording payments made. It maintained throughout the United States convenient offices where the customer could make such payments. In many instances the customer would make the payments to the dealer, notwithstanding that his contract provided otherwise, in which event the dealer would accept the payments and periodically transmit them to the defendant. In event of default, the defendant mailed to the customer a series of follow-up letters, ten in number, in an effort to collect the defaulted payments. The letters state the cost of each is 25 cents. When this series of letters did not accomplish the result, individual letters were dictated; if these were unsuccessful, representatives employed and paid for by the defendant undertook to collect the defaulted payments by personal effort. At the same time, the dealer employed and paid men whose duty it was to collect defaulted installments. Both parties repossessed cars on occasion. If all efforts failed, the dealer took back the car, and made good his guaranty. By the terms of the plan, the defendant agreed to assist the dealer in eliminating credit hazards by putting at the command of the dealer an advisory credit service based upon the long and broad experience of the defendant.

There are other valuable features of the plan. In order to protect the customer, the dealer, and itself, the defendant at its own expense procured and sent to the customer a policy of insurance protecting the customer, dealer, and defendant, as their interests might appear, against loss by fire or theft.

In addition, the defendant agreed that the dealer should be relieved of his guaranty in event of loss of the car through collision, conversion, or confiscation, subject to certain conditions. No policy of insurance was issued as to these three hazards, and it does not appear that the defendant is engaged in the insurance business. It is clear, however, that the defendant, conditionally but substantially, protected the dealer against loss resulting from these three hazards.

As a further protection to the dealer against loss on his guaranty, there was set up against each contract a cash reserve, fixed by a sliding scale but approximately 1-1/2 per cent. of the face of the contract, which was paid to the dealer periodically as the contracts were liquidated.

The plan recognized that there should be a practical division of effort in the matter of collections from the customer. The defendant agreed that it would provide the customers with a record of the payments due; would conduct a consistent follow-up on delinquent accounts; would notify the dealer of all defaulted installments, and confer with him on cases needing personal contact; would cooperate with the dealer in making collections or repossessions; and would pay to the dealer rebates where the automobile was repossessed before the contract had fully run. These contract provisions were faithfully carried out, and the defendant maintained an elaborate organization, at its own expense, to assist in making collections from the customers.

The defendant required a dealer with whom it proposed to do business to execute an application for credit under the plan accompanied by a financial statement. The dealer also assigned to the defendant any credits which might be due the dealer from the General Motors Corporation or any of its subsidiaries, and agreed that any of such credits might at any time be applied on the indebtedness of the dealer to the defendant. That this assignment ordinarily operates only when the guaranty has become absolute by reason of the default of the purchaser, is

made clear by the next sentence, which provides that in event of the bankruptcy of the dealer, such credits may be retained until the contingent liability is terminated.

It further appears that where the defendant would not accept the paper under the plan, it did at times accept the paper upon a special and unconditional guaranty of the dealer. It appears that the practical effect of this unconditional guaranty was that the dealer waived the protection afforded by the plan as to collision, conversion, and confiscation.

Plaintiff concedes, as indeed it must, that all of the transactions sued on were carried out under this plan. The difference between the face of the customer's contract and the amount paid over to the dealer by the defendant, varied with the make and price of automobile sold. Taking as a fair example a type of car selected by the chief witness for the plaintiff, the plan worked substantially as follows: A dealer owned an automobile on which the cash price was $600.00. If it was sold on 12 months time, the purchaser would pay $200.00 down, and agree to pay $443.00 in twelve monthly installments. If the defendant accepted the contract, it immediately paid to the dealer $400.00. The balance of $43.00 is the amount which is the basis of the recovery in this action, the plaintiff having recovered twice that balance on each of the 4,000 cars where the contracts were disposed of to the defendant. For that $43.00, the defendant (a) was paid for the use of its money for the 12 months' period; (b) procured and furnished to the customer a policy insuring the automobile against fire and theft; (c) itself assumed the risk of loss arising from collision, conversion, or confiscation; (d) set up a dealer's reserve of $6.00, which was repaid to the dealer at intervals; (e) maintained an office at which the customer should make his payments, and assisted in the collection of defaulted installments. There is no evidence in the record as to the value of the five types of insurance which inured to the benefit of the dealer, the cost of which is absorbed from this $43.00; nor any evidence in the record as to the value of the services rendered in connection with the collections from the customers, which service inures to the benefit of the dealer.

In view of the fact that it is conceded by the plaintiff that all of the transactions for which recovery was had were transactions had under the plan as outlined, the testimony as to the alleged oral agreement is not of controlling importance, as heretofore stated.

The only testimony as to that agreement is that a branch manager of the defendant called upon the witness in May, 1928, and said: "That he had been advised by the Chevrolet Motor Company that I was joining the Mid-West Chevrolet Company, and that he was calling on us with the view to soliciting our account, the accounts of the Mid-West Chevrolet Company; that he would like to determine how much money would probably be required for our firm to carry on its business, and would like to discuss the terms under which they could furnish that money, and go over in detail the plans under which the General Motors Acceptance Corporation would furnish the money. That was about the extent of the conversation. It was more lengthy, of course, but that was the import of it."

It may be noted parenthetically that at the time of this conversation, plaintiff had been transacting business with the defendant under the same plan for several years. This conversation, although denied by the defendant, is not inconsistent with the transactions as carried out; nor is it satisfactory proof of an oral agreement to lend large sums of money, since it leaves untouched the important questions of the interest which the loans shall bear, and their maturities. The witness later testified that he was asked to furnish an application for a line of credit, accompanied by a financial statement, which he did. Plaintiff makes much of the conceded fact that it, with other dealers, was required to sign an application "for lines of credit to provide for sales of new and used cars under GMAC Retail Plan, and lines of credit under GMAC Wholesale Plan," and to accompany such applications for lines of credit with financial statements. We see no force in these contentions, nor any inconsistency between these facts and the plan as outlined. Under the plan, the dealer guaranteed the eventual payment of the contracts. If the customer did not pay out, if the automobile was not lost through any of the hazards insured against, the dealer must take the repossessed automobile and pay the amounts in default. An essential part of the plan was this contingent liability of the dealer. The contracts were purchased, of course, partly upon the strength of his guaranty and of his credit back of the guaranty. It was accordingly proper and appropriate that an application for such credit should be made, accompanied by a financial statement.

The judgment rendered is for twice the amount of the difference between the face of

the customers' contracts and the sums paid by the defendant to the plaintiff; that is to say, it is for twice the amount paid out by the defendant for the insurance policies; for twice the value of carrying the risks of collision, conversion, and confiscation; for twice the amount of the dealers' cash reserve, repaid to plaintiff before the suit was brought; for twice the value of the services performed, as well as twice the interest involved in the charge. Plaintiff concedes error in respect to the cash reserve and offers to remit from the judgment the sum of $53,043.20. But also included in the judgment is twice the amount of other items which, even if the transaction should be found to be a loan, cannot conceivably be considered as "interest" recoverable under the Oklahoma statute, and which it would be manifestly unjust to permit the plaintiff to recover back after it has had the benefit thereof. There is no essential difference between the cash reserve, where error is conceded, and other outlays that cannot by any stretch of the imagination be considered as interest on a loan.

Is there here any substantial evidence to sustain the finding of the jury that the transactions were not what they purported to be, but on the contrary were a sham and device to conceal the exaction of usurious interest? What the plaintiff has proved in a typical case is that for the sum of $43.00, the defendant has furnished a fire and theft insurance policy, carried the hazard of collision, conversion, and confiscation, performed valuable services in connection with the collection of the paper, as well as recouped the value of the use of its money for the 12-month period. There is not a word in the record as to the value or cost of the insurance features, or the value or cost of the services performed. In the absence of proof that the value of the insurance carried and the services performed is an inconsequential part of the charge made, there was no evidence upon which to base a finding that the entire plan was a device by which the exaction of usurious interest was to be concealed. Certainly it cannot be said, as a matter of law, that the cost of carrying insurance against the hazards of fire, theft, and collision is trivial; those who own automobiles can attest the contrary. In this vital respect, the record differs from that in Missouri, K. & T. Trust Co. v. Krumseig, 172 U. S. 351, 19 S. Ct. 179, 43 L. Ed. 474, where the proof was that, after deducting the ordinary cost of the insurance, the amount left for interest was largely in excess of the statutory limit. Nor can the services agreed to

be performed, and actually performed, be said, as a matter of law, to be so insignificant as to bring the facts within the rule of Brierley v. Commercial Credit Co. (D. C. Pa.) 43 F.(2d) 724, rather than within the rule announced in Houghton v. Burden, 228 U. S. 161, 33 S. Ct. 491, 57 L. Ed. 780, In re Mesibovsky (C. C. A. 2) 200 F. 562, Siebert v. Hall (C. C. A. 8) 63 F.(2d) 517, and other cases cited, supra.

In the absence, therefore, of any proof of the cost or value of these features of the plan, a finding that transactions which embodied such features were but shams and devices to evade the usury laws is without evidence to support it. There is no substantial evidence, therefore, that the transactions were not sales of contracts, as the writings disclose, but loans. But if our conclusion were otherwise on this point, the record would still be barren of evidence that the sum exacted for interest, exclusive of a fair charge for the insurance and services rendered, exceeds the maximum prescribed by the Oklahoma statute. We conclude, therefore, that the motion for a directed verdict should have been sustained.

 The plaintiff contends that the charge exacted being an entire one, the burden of proof of the value of such insurance and services is upon the defendant. The basis of this contention is that the proof of these facts is within the exclusive control of the defendant. Not so. The value of the insurance features can be ascertained by inquiry at the office of any insurance agent. The plaintiff knows the services which were performed by the defendant in connection with the collection of this paper, and is as well advised as the defendant of the value thereof. The plaintiff entered into these transactions without requiring a segregation of the items entering into the charge, and cannot avail itself of its own voluntary act to escape the burden which the law casts upon it to prove that the transactions were not what they purport to be, and that usury was exacted. While the courts will probe to the bottom of any transaction where usury is asserted, yet when the probe is completed, the judgment must rest upon evidence and not conjecture.

 The statute limits recovery to the person by whom the usurious interest has been paid. Appellant points out the fact that of the $1,456,756.00 collected by it upon such contracts, all but the sum of about $59,-000 was paid by the customers of the plaintiff and not by the plaintiff. The argument

is then made that the plaintiff is not entitled to recover even usurious interest which is in fact paid by the customers of the plaintiff. Upon first blush, the contention is a plausible one. It is true that, except in a negligible number of instances, the judgment is on account of contracts which the customers have paid out on, and we have what appears to be a bizarre result in permitting a dealer, whose customer has paid to the Acceptance Corporation the sum of $43.00 for interest and insurance, to recover from the Acceptance Corporation the sum of $86.00. It is conceded, however, that the plaintiff owned the automobiles which it sold, and could lawfully make one price for a cash sale and any other price for a time sale. It is likewise true that plaintiff owned the conditional sales contracts of its customers, and could do with them as it pleased. If in fact plaintiff borrowed money from the defendant, and if the defendant exacted a usurious rate of interest for the loan, it is no answer to say that the plaintiff profited by virtue of the higher price it charged for cars sold on time. No contention is made that the plaintiff and the defendant together conspired to exact a usurious rate of interest from the customer. Appellant further contends that a corporation may not recover usury in Oklahoma. Until the Oklahoma Supreme Court holds to the contrary, we are of the opinion that under the liberal construction which must be accorded the statute, the word "person" includes a corporation.

It may be well to mention one other assignment of error. It appears that about the time the relations between the parties were severed, the plaintiff prepared a receipt for certain automobiles, to be signed by the defendant, which narrated the fact that the sales contracts had been theretofore assigned as collateral security for moneys advanced. In our opinion the objection to this evidence should have been sustained. The receipt runs to the Roberts Chevrolet Company, and recites that the contracts were assigned for moneys advanced to the Roberts Chevrolet Company; more significant still, it was signed by a representative of the defendant without any showing that he was authorized to bind the corporation by a narration of past events, or that he had any personal knowledge of the events he purported to narrate.

It follows that the judgment should be reversed and the cause remanded for a new trial.

Reversed and remanded.