154 So.2d 883 (1963)
INDIAN LAKE ESTATES, INC., a Florida corporation, and Caroline T. Zappa, also known as Caroline T. Maisano, Appellants,
v.
SPECIAL INVESTMENTS, INC., a District of Columbia corporation, Indian Lake Estates Trustee, Inc., a Florida corporation, Reginald G. Hainsworth et ux., Wendell A. Shelton et ux., and Gustave Weinstein et ux., et al., Appellees.
No. 2949.
District Court of Appeal of Florida. Second District.
May 15, 1963.
Rehearing Denied July 18, 1963.
*884 William A. Gillen and Ronald D. McCall, of Fowler, White, Gillen, Humkey & Trenam, Tampa, and Clinton A. Curtis, of Woolfolk, Myers & Curtis, Lake Wales, for appellants.
E. Snow Martin, of Martin & Martin, Lakeland, for appellees Special Investments, Inc., and Indian Lake Estates Trustee, Inc.
Chesterfield H. Smith and Stephen H. Grimes, of Holland, Bevis & Smith, Bartow, for appellees Hainsworth, Shelton and Weinstein.
SHANNON, Chief Judge.
The appellants, defendants below, appeal from a summary final decree, which was amended on petition for rehearing.
We have also had before us interlocutory appeals in Special Investments, Inc., v. Indian Lake Estates, Inc., Fla.App., 154 So.2d 892; Indian Lake Estates, Inc., v. Special Investments, Inc., Fla.App., 154 So.2d 892; and Indian Lake Estates, Inc., v. Indian Lake Club, Fla.App., 154 So.2d 893, upon which, for reasons of convenience, disposition has been deferred until after arguments in the present case. This case is being appealed by Indian Lake Estates, Inc., and Caroline T. Zappa, also known as Caroline T. Maisano. Appellant Indian Lake Estates, Inc., will be referred to as ILE, or simply appellant, while `appellee' is in reference to Special Investments, Inc. All other parties will be referred to by name.
The questions of law in this appeal are not overly complex, but the facts in the case are quite involved. The summary final decree below is quite extensive, containing some thirteen pages. The order denying the petition for rehearing not only denies said rehearing, but also clarifies the final decree, and this order contains some five pages. For the purpose of setting forth what we consider the salient facts, we will quote extensively from these orders, as we feel that the chancellor below, the Honorable William K. Love, did an excellent job of setting out the detailed facts. In the final decree Judge Love summarized as follows:
"This controversy arose in connecnection with the efforts of one Leon Ackerman to finance and complete a large real estate development in this county and state. The venture, from its inception, was highly speculative and its chances of success depended first upon the acquisition of financing and thereafter upon an intensive advertising program and an effective sales program. The lands involved were flat woods bordering upon a lake and situate many miles from any incorporated municipality. It is interesting to note that the promoter, Mr. Ackerman, those who financed him and the thousands who purchased lots in the property were not Floridians. The development was not one which would appeal to any prudent investor interested in a sound investment for a nominal return. Mr. Ackerman has, in the past, engaged in like ventures with varying degrees of success and had obtained operational funds through the form of selling, at discount, contracts representing deferred portions of the contract prices of the lot. In the past he had obtained advances through the sale of contracts to certain individuals in Washington and although the arrangements in the current development were in the form of agreements with various joint ventures, each of the ventures was composed, in the great financial majority by the same group of men. The joint venture agreements were normally executed *885 by those men individually and as agents for the other joint venturers. Each venture was arranged, formed and determined through that group, although comparatively small investors dropped in and dropped out of the series of groups. Some contracts were discounted to others and some of the ventures encompassed investments other than Indian Lake Estates.
* * * * * *
"The Complaint filed in this cause on the 3rd day of August, 1960, by the plaintiff, Special Investments, Inc., and amended by Amendment to Complaint filed on September 19, 1960, seeks to enforce the terms and provisions of an instrument attached to the Complaint as Exhibit E, and commonly referred to in these proceedings as the settlement agreement of October 26, 1959, in and by which Indian Lake Estates, Inc. (Page 10, paragraph 9(c)) agreed to continue to collect monies from lot sale or purchase contracts then owned by the plaintiff and to deposit daily in the depository of the plaintiff all monies so collected, and to report fully to the plaintiff concerning the breakdown on the amount of interest and principal collected.
"The defendant filed answers to such Complaint as amended alleging that the assignment of such contracts to Special Investments, Inc. and its predecessors in title was unenforceable for the reasons that:
"1. The contracts themselves prohibited their being assigned unless the assignee joined in an instrument in writing evidencing its acceptance and assumption of the duties and obligations of Indian Lake Estates, Inc. under the provisions of said sales contracts.
"2. That Indian Lake Estates, Inc. was entitled to retain the proceeds of such contracts for the purpose of fulfilling its obligation on the covenants contained in such contracts.
"3. That the transactions by which Special Investments, Inc. and its predecessors in title acquired the lot sale contracts were in fact loan transactions rather than sale transactions, and that they were infected with usury and unenforceable.
* * * * * *
"* * * A joint venture was formed by a group of approximately 35 individuals under the name of `Lake Wales Group', which did the original financing of this enterprise. Mr. Ackerman proposed that this development be financed by the sale of a 10% participation in gross receipts of defendant's corporation. (Friedlander deposition, p. 36). The device of selling a percentage participation in gross receipts, known as an override, had previously been employed by Mr. Ackerman in similar real estate operations at Ocean Beach and South Ocean Beach, Maryland. (Bryan deposition, p. 10). The arrangement effecting this financing took the form of a $50,000 loan at 4% and $50,000 for the purchase of certain bonds issued by defendant, which bonds were redeemable by 10% of the gross receipts of Indian Lake Estates, Inc. from all lots in the proposed development. There were certain other security provisions concerning it.
* * * * * *
"Later in the affairs of the development, Ackerman proposed to sell a 5% participation in the gross receipts of Indian Lake Estates, Inc. in return for $150,000, and an agreement was made concerning it on March 1, 1958 with a joint venture known as the `Cypress Group'. (See Bryan deposition, p. 26; Friedlander deposition, pp. 155, 164 and 214; Lichtman deposition, pp. 85 and 86.)
* * * * * *

*886 "In October 1958, a joint venture known as the `Barmit Group' was formed who made a cash loan of $500,000 to Indian Lake Estates, Inc. secured by a mortgage evidenced by a bond issue.
* * * * * *
"Indian Lake Estates, Inc., sold, as is shown by its income tax returns which are before the Court, a great number of lots for cash and a lesser amount on the installment plan with payments extending over a period of years. After several months, defendant Indian Lake Estates, Inc. had accumulated a substantial number of lot purchase contracts, and found it advisable, in order to finance its development operations, to sell these installment contracts at a discount. In May 1956, a joint venture was organized, known as `First Lake Group', to purchase these contracts. * * *"
The foregoing is an example of the type of financing employed in the formation of the joint ventures. There were eventually more than one of these joint ventures, which were known as the Lake Groups, and which were designated as 1st to 12th inclusive, and 14th and 15th. The chancellor below found in his final decree that the discount on the various transactions between ILE and various Lake Groups was 35%, except for one or two, where the discount was 40%. In every instance ILE was to collect the installments and remit them to the Lake Group which had purchased the contracts in question. We quote again from the chancellor's final decree:
"It is apparent that the corporation, Special Investments, Inc., was organized at the instance of the controlling members of the groups in order to arrange a sale of the group contracts and thereby obtain the benefits, for income tax purposes, of a capital gain. The terms of the sale of the contracts from the groups to Special Investments, Inc., clearly demonstrate that the stockholders of Special Investments, Inc., had nothing to lose and were assured of a return of approximately 10% on their investments. This fact in no wise convinces the Court that Special Investments, Inc., was not a separate entity or constituted a pure fiction."
In April, 1959, ILE was in default on its obligations under the Lake Wales agreement, Cypress Agreement, and a certain note and mortgage. Various independent investors were pressing for compliance with these obligations and there was talk of foreclosing under the above mentioned mortgage. Negotiations were carried on between the investors and the vice president of ILE and also a member of the Board of Directors of the Alaska Oil and Mineral Company, looking to settlement. Such a settlement was made on October 26, 1959. Again we quote from the chancellor's final decree:
"The settlement agreement was worked out with the express approval of Alaska Oil and Mineral Company, which was kept informed of the negotiations as they progressed by Mr. Morgan and finally approved the terms of the settlement agreement as a condition to the stock exchange whereby Indian Lake Estates, Inc. became a wholly-owned subsidiary of Alaska Oil and Mineral Company. On October 2, 1959, Alaska Oil and Mineral Company entered into a `letter agreement' with Mr. Ackerman, providing for the stock exchange. The letter agreement required as a condition a first mortgage loan, and also required that Mr. Ackerman `will have effected a compromise of all other obligations of the corporation in such manner that the current assets of the corporation will exceed by $300,000 all current liabilities.' (p. 298). It is clear that Alaska Oil and Mineral Company had actual knowledge as to the nature of these obligations, and that Mr. Morgan informed Mr. Zappa, president of Alaska Oil and Mineral Company, regarding the progress of the *887 settlement negotiations, the release, and the precise terms of the agreement later signed on October 26. * * *
* * * * * *
"Following December 5, 1959, when the stock exchange occurred and Alaska Oil and Mineral Company assumed full control of Indian Lake Estates, Inc., the October 26 settlement agreement was complied with until February. Between February and May there were certain relatively minor defaults on the part of Indian Lake Estates, Inc. (Deposition of Caroline Zappa, pp. 187, 189, 192-195; Theodore Zappa, pp. 326-328). In May 1960, Indian Lake Estates, Inc. ceased remittances to Special Investments, Inc. which the settlement agreement required Indian Lake Estates, Inc. to make, as a fiduciary, in respect to lot contracts which had been assigned by Indian Lake Estates, Inc. to the plaintiff. This default occurred because the new management of Indian Lake Estates, Inc. decided that the contractual obligations which had been settled and compromised under the 1959 settlement agreement `were eminently unfair to Indian Lake Estates and to its property owners. * * *' (Theodore Zappa deposition, p. 321). When stoppage of these remittances [w]as being considdered by the new management of Indian Lake Estates, Inc., `Mr. Morgan pointed out that there was a release made, which we all remembered very well * * *'"
The chancellor in the decretal part of his final decree stated, in part, that:
"It is therefore upon consideration thereof
"ORDERED, ADJUDGED, DECREED AND DECLARED as follows:
"1. Alaska Oil and Mineral Company, now the owner of all stock of Indian Lake Estates, Inc., acquired it from Leon Ackerman, the then sole stockholder of Indian Lake Estates, Inc., on the basis that the sale by Indian Lake Estates, Inc. of these contracts receivable was a valid sale, not a loan, and that Indian Lake Estates, Inc. had no claim or right to assert any claim against them or against the holders of them. To allow Alaska Oil and Mineral Company through its wholly-owned subsidiary now to assert the defense of usury or counterclaim for penalties under the usury laws would have the effect of this Court's changing the purchase price Alaska Oil and Mineral Company paid Ackerman for his stock and effect an unjust enrichment of Alaska Oil and Mineral Company. Therefore, Indian Lake Estates, Inc. is here estopped to assert the defense of usury or to counterclaim for penalties under the usury statutes.
* * * * * *
"5. That an accounting be had between Indian Lake Estates, Inc. and Special Investments, Inc. to determine whether all monies coming into the hands of Indian Lake Estates, Inc. have by it been appropriately applied. The parties hereto are given thirty days to agree upon an accountant for such purpose. * * *"
The chancellor in his order denying petition for rehearing further stated:
"The Court finds that the assignment of the contracts for the purchase and sale of lots in Indian Lake Estates to the various Lake Groups were, in fact and in law, sales and not loans; that if loans, they were usurious and were illegal and void under the laws of the State of Florida; and even if usurious, and therefore, illegal and void that the Defendants, Indian Lake Estates, is estopped to assert such defenses as against the Plaintiff for the reason set forth in the Final Decree.
"The Court further found that the provision of the code of the District of *888 Columbia was not applicable as the members of the various Lake Groups were not engaged in the business of making loans within the meaning of the law. * * *"
Appellant ILE complains primarily of four alleged errors, and frames its points as follows:
1. The transactions between ILE and First through Twelfth Lake Groups were loans, not sales, as disclosed by the instruments themselves, the practices of the parties and the security features involved therein.
2. The transactions between ILE and First through Twelfth Lake Groups were loans at usurious rates of interest and were illegal and unenforceable under the laws of Florida and the District of Columbia.
3. The agreement of October 26, 1959, did not purge the transactions between ILE and First through Twelfth Lake Groups of usury.
4. ILE is not estopped to assert the usurious character of the transactions with First through Twelfth Lake Groups.
The appellant, Caroline T. Zappa, also known as Caroline T. Maisano, has set forth two points in which she alleges the chancellor below committed error, her points being:
1. The plaintiff sought no relief against Mrs. Maisano, and no relief herein properly could be awarded against her.
2. The chancellor erred in retaining jurisdiction over Mrs. Maisano because the moneys being paid to Indian Lake Estates are now being collected by Corneal B. Myers, and not Mrs. Maisano.
For the purposes of this decision, therefore, we must first decide whether or not the transactions between ILE and the Lake Groups were sales or loans, and, if we find that they were loans, whether or not the settlement agreement of October 26, 1959, purged the transactions of usury.
We have excellent briefs from all parties in this case. However, in making a study of the question here involved, to say that there is a conflict in the decided cases is to put it mildly. Since there is this conflict, we have to take the effects as exemplified by the record and interpret them with the principles of law which we deem pertinent.
In the earliest stages, practically all of the officers who were dealing in these transactions deemed them sales, and it was not until ILE filed its answer that the transactions were generally referred to as loans. The appellant in its brief and during the oral argument set out various aspects of the agreements which it felt almost conclusively marked the transactions as loans. Such aspects include: the fact of the large discounts; the fact that the contracts receivable were assigned "with recourse," and with guaranty of payment; the fact that collection and collection expenses were to be handled by ILE; and the fact that no notice was given to the lot buyers as to the assignments.
It is quite clear that all of the facts cited by the appellant are true, but it is also quite clear that a decision in this case cannot rest on a mere question of form. We are concerned with whether, at the time the transactions were entered into, they were purchases or whether they were loans.
Contractors are free to buy and sell their property, including promissory notes and other instruments, at a price agreed upon, and when the bona fides of the parties is established the percentage of profit has no relation to the usury law. Milana v. Credit Discount Co., 1945, 27 Cal.2d 335, 163 P.2d 869, 165 A.L.R. 621. And, "It is well settled in Florida that the law will look to the substance of the transaction rather than to the form to determine usury." Kay v. Amendola, Fla.App. 1961, 129 So.2d 170. It is clear that the intent of the parties controls in these cases. Griffin v. Kelly, Fla. *889 1957, 92 So.2d 515. All of the negotiations, circumstances and conduct of the parties surrounding and connected with their contracts may be material in determining whether the form thereof covered an intent to violate the usury law, and the burden of establishing evasion must be met by evidence clearly showing the intent. Milana v. Credit Discount Co., supra.
Appellant has cited many cases, some of which should be mentioned. In Milana v. Credit Discount Co., supra, the court held that it is competent for the trier of the facts to find that a transaction by which accounts receivable were sold at a discount was a loan, and as such, subject to the usury law, where, although the debtors were notified of the assignment and directed to make their remittances to the assignee, the seller guaranteed the payment of the accounts within sixty days and was required to purchase those not paid within such period. Another case cited by the appellant is Union Securities, Inc. v. Merchants Trust & Savings Co., 1933, 205 Ind. 127, 185 N.E. 150, 186 N.E. 261, 95 A.L.R. 1189, where it was held that a transaction whereby accounts receivable were assigned to another was a loan, although denominated by the parties as a sale of accounts. In the Union Securities case the arrangement was that the assignee should advance 88% of the face value of the accounts assigned, pay over an additional 10% when the accounts should be paid, and keep 2% as its profits. The assignor was to become surety for the payment of such accounts, and collect them at its own expense; and the customers whose accounts were assigned were not notified of that fact. But in the Union Securities case it was admitted that if the transaction is termed a sale, such is presumed, unless from all of the facts of the transaction it clearly appears that what the parties called a sale was in reality not a sale, but a loan. It seems that the court in that case, in finding a loan, relied mainly on the fact that the seller was required to guarantee the payments at the amount of 2% a month, i.e., had to pay 2% a month for such amounts as were due and not remitted to the assignee.
As we have stated, the appellant mentions and discusses an extremely large number of cases in its argument, ending with a succinct statement of the facts which it feels makes this a loan transaction, viz.:
"The basic point is that there was a debtor-creditor relationship between ILE and said lake groups. ILE guaranteed the payment of the face amount of the contracts receivable, with interest. ILE pledged or arranged for the pledging of Mr. Ackerman's stock as security for the performance of its part of the agreement. ILE pledged the contracts receivable as collateral security for the payment of the loans. ILE agreed to substitute accounts receivable which were current in payment for any which had been assigned to the numbered lake groups which became delinquent or in default. The lot purchasers were never notified of the assignments of their contracts. The lake groups assumed no obligations to the lot buyers. The numbered lake groups never looked to any of the lot purchasers for the payment of any amounts due. The lake groups looked only to ILE."
The appellee has also cited a large number of cases in support of its views, at the same time seeking to distinguish the appellant's cases. For instance, one point upon which the appellant relies heavily is the fact that the agreements contained provisions for recourse or guaranty. However, Williston on Contracts (Rev.Ed.), Sec. 1689, states:
"The bargain, however, is in terms not a loan but a sale, and though accompanied with a guaranty of the value of the article sold, it should not be regarded as within the purview of statutes against usury, unless the parties are in fact intending a loan rather than a sale; and this is the more general rule."
*890 The one case cited by the appellee that is most persuasive to us is General Motors Acceptance Corp. v. Mid-West Chevrolet Co., 66 F.2d 1 (C.C.A. 10th 1933), wherein it is stated that:
"Before there can be usury, there must be a loan. (Citations). A loan of money involves an absolute agreement to return the sum borrowed at a future time. (Citation). No usury can attach to a bona fide sale of property, tangible or intangible, even though it is accompanied by an agreement of the seller to indemnify the buyer against loss.
"From these rules of law, it will be seen that the controlling question is whether or not there was substantial evidence from which a jury might find that in the acquisition of the 4,000 conditional sales contracts herein involved, the defendant did not purchase them with a contingent guaranty of the plaintiff's as it purported to do, but that in truth and fact the defendant was lending money to the plaintiff at usurious rates of interest, and that the whole series of transactions was but a device and a sham to conceal the usury and evade the law. * * * We turn then to the undisputed facts of what happened."
The court there, as in the case at bar, found from the undisputed facts that the transactions were sales and not loans. The appellee notes that in a long footnote at 66 F.2d 4, the court cited and distinguished many of the cases relied upon by the appellant. See also, Commercial Discount Company v. Rutledge, 297 F.2d 370, (U.S.C.A. 10th 1961), affirming Mid-West, supra.
In the case of Coast Finance Corporation v. Powers Furniture Company, 1922, 105 Or. 339, 209 P. 614, 24 A.L.R. 855, the assignor sold all its interest in the first $100.00 collected on a conditional sales installment contract, agreeing to collect for the assignee, and even guaranteed the monthly installments. The court held this a sale, stating that:
"When the holder of an instrument, such as the conditional sales contract held by the defendant, transfers the instrument at a discount and is required to indorse or otherwise guarantee it so that the vendor becomes liable contingently to pay the purchaser at a future day a sum greater than that received with legal interest, the authorities present different views. The great weight of authority is that such a transaction should be regarded as a valid sale of a chattel with a warranty of soundness, and the purchaser is allowed to enforce the obligation to its full extent against his own indorser and all prior parties."
The Coast Finance Corporation case was cited, and apparently is the basis for the decision in Starker v. Heckart, 1954, 200 Or. 573, 267 P.2d 219.
A case very similar to the one we are discussing was Webster v. Sterling Finance Co., 1946, 355 Mo. 193, 195 S.W.2d 509, which involved the sale of conditional sales notes at discount, with recourse. The court, in finding that this was a valid sale, noted how the courts will pierce the veil of camouflage disguising a usurious transaction. "* * * [B]ut there must be substantial evidence that the transaction and instrument suspected is camouflage or cloak to conceal the forbidden usury, and unless there is such evidence the charge of usury must fail as would any other issue fail if not supported by substantial evidence. Usury will not be presumed. The burden to establish usury rests upon the party seeking to impeach a transaction on the ground that it is tainted with usury." Accord, Anderson v. Curls, Mo. App. 1958, 309 S.W.2d 692.
The Annotation in 165 A.L.R. 626, relied upon by both parties to this appeal, emphasizes the fact that each case is dependent upon the findings of fact concerning the transaction, the intent of the parties, *891 etc. Each party relies heavily on this annotation for its source of case law. It is stated at p. 649 that:
"It is a general rule that the sale or transfer of a conditional sales contract or similar paper evidencing an obligation to pay for tangible personal property sold by the transferor to a customer, to a purchaser or transferee, such as a finance company, at a discount amounting to more than legal interest, does not fall within the provisions of the usury laws relating to loans beyond specified interest rates, and is not usurious, in the absence of special facts showing either that there was usury in the original transaction to which the transferee was a party or of which he had knowledge, actual or imputable, or that there was some oppressive exaction in the sale or transfer upon the part of the seller or transferor, or unless it is plainly deducible from the facts as a whole that the form of the transaction was a mere subterfuge for the concealment of usury."
For an affirmance of this statement see Martin v. McAvoy, 1924, 130 Wash. 641, 228 P. 694; General Motors Acceptance Corp. v. Weinrich, 1924, 218 Mo. App. 68, 262 S.W. 425; and Cullum v. General Motors Acceptance Corp., 68 F.2d 310 (C.C.A. 5th 1933), (conditional sale installment contracts, sold at discount, with guaranty of payment). See also, 95 A.L.R. 1197.
Appellee stresses that appellant overlooked the fact that in many of the cases cited by the appellant the courts emphasized that interest was charged on advances of money, whereas, in the instant case, ILE did not bind itself to pay interest on money it received. Further, as to appellant's excerpts from A.L.R. Annotations, already discussed, it should be emphasized that the agreements here do not involve ordinary accounts receivable, but the sale of lot purchase installment contracts. A transfer at a discount of installment sales contracts covering tangible personal property or real estate is regarded as a sale, not a loan, despite a provision for recourse or guaranty. See 165 A.L.R. 695-697.
Having concluded that the transactions involved herein are sales and not loans, the final summary decree of the chancellor, dated October 6, 1961, as well as the order amending the decree, on petition for rehearing, dated November 10, 1961, are hereby affirmed.
The chancellor below saw fit in his final decree to retain jurisdiction over the appellant, Caroline T. (Zappa) Maisano, in view of the fact that she was treasurer of ILE, and that personal jurisdiction over her might be necessary to effect full compliance with the orders or decrees of such court. She argues that this was error due to the fact that she no longer is collecting money for the corporation. However, we can see no prejudice to her from the court's retaining such jurisdiction. In fact, contrary to her arguments, we do feel that she "has or claims an interest adverse to the plaintiff," F.R.C.P. 1.17(a), 30 F.S.A., and that such retention is proper. See Degge v. First State Bank of Eustis, 1941, 145 Fla. 438, 199 So. 564, where it was noted that "[a]ny person may be made a defendant who has or claims an interest adverse to the plaintiff. Any person may at any time be made a party if his presence may be necessary or proper to a complete determination of the cause."
The chancellor also denied a petition for release of the funds that are being held under stipulation of counsel and a previous order of the lower court. In view of the facts in the instant case, as well as the facts in the three interlocutory appeals which are mentioned in this opinion, this court, at this time, is specifically affirming the order of the court below denying a release until such time as it has been determined that such funds are not obligated *892 for the benefit of the intervenors or any other parties in these cases.
Affirmed.
ALLEN, J., and WHITE, JOS. S., Associate Judge, concur.