**AMERICAN ACCEPTANCE CORPORA-TION, Appellant,**

v.

**Edward P. SCHOENTHALER and Agnes A. Schoenthaler, Husband and Wife et al., Appellees.**

**No. 23457.**

United States Court of Appeals
Fifth Circuit.

Jan. 29, 1968.

Rehearing En Banc Denied
March 27, 1968.

Certiorari Denied June 17, 1968.

See 88 S.Ct. 2287.

W. G. Ward, Aaron M. Kanner, Richard Kanner, Miami, Fla., for appellant.

Thomas A. Horkan, Jr., Miami, Fla., Harry G. Carratt, Charles R. Morgan, Fort Lauderdale, Fla., for appellees.

Before PHILLIPS,* COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

This suit by plaintiff-appellant, American Acceptance Corporation (herein AAC), initially sought to foreclose a real and chattel mortgage held by it as assignee of The Maxwell Company (the original mortgagee) on certain property against Edward P. and Agnes A. Schoenthaler (herein Schoenthaler or the Schoenthalers) as mortgagors and divers defendants who claimed an interest or lien upon the property in question. The latter mortgages and claims were inferior to a first mortgage held by Central States, Southeast and Southwest Areas Pension Fund (herein Union Pension Fund), and plaintiff's second mortgage liens on the property which secured the notes in question, as well as the claims of the other defendants. They were extinguished during the course of these proceedings by the foreclosure of the first mortgage in a state court. Thus, the only issue remaining as between the plaintiff and defendants Schoenthalers is as to the amount owing, if any, on the two promissory notes formerly secured by the mortgages—the Schoenthalers asserting their invalidity because of civil and criminal usury.

Collateral to this issue is the liability of the defendant Willis H. Yeamans on his personal guaranty of $100,000 of the Schoenthalers' indebtedness. The plaintiff and defendants Schoenthalers agreed to submit the case to the Court sitting without a jury on the basis of the pretrial stipulation and exhibits thereto, the pleadings, and depositions.

Defendant Yeamans alleged in his Counterclaim against AAC that AAC was holding $100,000 to secure defendant Yeaman's guaranty of a portion of the mortgage indebtedness. He further alleged that there had been material breaches of the guaranty agreement, resulting in its termination and, in addition, that AAC was guilty of criminal usury, as defined in Section 687.07, Florida Statutes 1965, F.S.A., terminating defendant's guaranty. The parties *stipulated* that the $100,000 held by AAC was the property of Dr. Yeamans.

This case involves construction and application of the Florida usury statutes.[1]

---

* Of the Tenth Circuit, sitting by designation.

1. 687.03. Unlawful rates of interest defined; proviso.—It shall be usury and unlawful for any person, or for any agent, officer or other representative of any person, to reserve, charge or take for any loan, or for any advance of money, or for forbearance to enforce the collection of any sum of money, except upon an obligation of a corporation, a rate of interest greater than ten per cent per annum, either directly or indirectly, by way of commission for advances, discounts, exchange, or by any contract, contrivance or device whatever, whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of ten per cent; and such transactions with a corporation shall, whereby the corporation pays interest, be usury and unlawful if for a rate of interest greater than fifteen per cent per annum. The provisions of this section shall not apply to sales of bonds in excess of one hundred dollars and mortgages securing the same, or money loaned on bonds.

History.—§ 2, ch. 4022, 1891; GS 3105; § 2, ch. 5960, 1909; RGS 4851; CGL 6938; § 2, ch. 29705, 1955.

cf.—§ 1.01(3), "Person" defined.

687.04. Penalty for usury, not to apply to transferee of negotiable paper unless usury appears on face.—Any person, or any agent, officer or other representative of any person, willfully violating the provisions of § 687.03 shall forfeit the entire interest so charged, or contracted to be charged or reserved, and only the actual principal sum of such usurious contract can be enforced in any court in this state, either at law or in

We hold that the trial court correctly construed and applied these statutes as requiring a forfeiture of both principal and interest, and accordingly affirm.

The basic facts are undisputed. Defendants Schoenthalers, as owners, caused The Tahitian Cove Motel to be constructed in Naples, Florida, having obtained primary financing for this purpose from the Union Pension Fund. The Union Pension Fund thereupon received a first mortgage on the premises. The Schoenthalers were overextended creditwise. They needed secondary financing for their motel project to purchase furnishings and fixtures, and to satisfy a mortgage on the premises held by defendant Willis H. Yeamans (from whom the property was purchased). Satisfaction of the Yeamans mortgage was a requirement of the first mortgage. Also necessary for the launching of the venture was cash for operating expenses.

On April 28, 1964, Maxwell and the Schoenthalers entered into a commitment letter agreement pursuant to which Maxwell agreed to sell the Schoenthalers furniture, fixtures, carpets, and other sundry equipment selected by Schoenthalers for a cash price of $180,000 or a time price of $238,484.14, and to lend Schoenthalers $170,000 at 10 per cent simple interest. The Schoenthalers were to execute two promissory notes to evidence the indebtedness: one note in the amount of $238,484.14 payable without interest prior to maturity, and the other note in the amount of $170,000 bearing 10 per cent simple interest per annum from date.

It was provided that both notes were to be paid with a single monthly payment of $7,612.50 commencing August 1, 1964, and paid continuously for 59 successive months thereafter. The monthly payment was to be first applied to the accrued interest on the $170,000 note and then toward the payment of the principal of the note for $238,484.14 and, when the latter note was fully paid, then to the payment of principal and interest on the $170,000 note. The commitment letter also required the Schoenthalers to furnish a guaranty from defendant Willis H. Yeamans in the amount of $100,-000 guaranteeing their obligation to that

equity; and when said usurious interest is taken or reserved, or has been paid, then and in that event the person, who has taken or reserved, or has been paid, either directly or indirectly, such usurious interest, shall forfeit to the party from whom such usurious interest has been reserved, taken or exacted in any way, double the amount of interest so reserved, taken or exacted; provided, however, that this shall not apply to a bona fide endorsee or transferee of negotiable paper purchased before maturity, unless the usurious character should appear upon its face, or that the said endorsee or transferee shall have had actual notice of the same before the purchase of such paper, but in such event double the amount of such usurious interest may be recovered after payment, by action against the party originally exacting the same, in any court of competent jurisdiction in this state, together with an attorney's fee, as provided in § 687.06.

History.—§ 3, ch. 4022, 1891; GS 3106; § 3, ch. 5960, 1909; RGS 4852; CGL 6939.

687.07. Forfeiture and penalty in case of excessive interest or charges.—Any person, or the agent, officer or other representative of any person, lending money in this state who shall willfully and knowingly charge or accept any sum of money greater than the sum of money loaned, and an additional sum of money equal to twenty-five per cent per annum upon the principal sum loaned, by any contract, contrivance or device whatever, directly or indirectly, by way of commissions, discount, exchange, interest, pretended sale of any article, assignment of salary or wages, inspection fees or other fees or otherwise, or for forbearing to enforce the collection of such moneys or otherwise, shall forfeit the entire sum, both the principal and interest, to the party charged such usurious interest, and shall be deemed guilty of a misdemeanor, and on conviction, be fined not more than one hundred dollars, or be imprisoned in the county jail not more than ninety days.

History.—§ 5, ch. 5960, 1909; RGS 4855, 5689; CGL 6942, 7903.

cf.—§ 775.06 Alternative punishment.

**68**

extent. $100,000 was to be placed in escrow to guarantee this obligation.

On May 26, 1964, the Schoenthalers executed and delivered to Maxwell the two promissory notes above described. These notes are the subject matter of this suit. No payments have been made on either note. On the same date, May 26, 1964, Schoenthaler executed a guaranty agreement by the terms of which he authorized and directed Maxwell to forward $100,000 as part of the loan of $170,000 directly to AAC as escrow holder. Yeamans disputes that either he or anyone on his behalf had authority to or did in fact designate the AAC as escrow holder. It is without dispute, however, that this $100,000 was never withdrawn by AAC from its account and paid to anyone and was not in any way segregated, but to the contrary remained in AAC's general bank accounts. From AAC's books there is no way of identifying this sum or even identifying the bank account where the funds are deposited. AAC has treated the money as its own and has shown the $100,000 simply as a liability on its books. For this and other reasons, defendant Yeamans by counterclaim asserted a breach or material alteration of the guaranty agreement.

Between June 1 and July 10, 1964, furniture of a total value of $212,887.82 was delivered by Maxwell to the Schoenthalers. On July 10, 1964, AAC paid $37,112.18 to the Schoenthalers, making a total disbursement to them on or before July 10, 1964, of $250,000.

On June 9, 1964, Maxwell delivered its demand promissory note to AAC for $350,000 and indorsed the Schoenthalers' notes with recourse. Thereupon, AAC paid $25,000 to The Simmons Company on Maxwell's account; paid $211,664.43 to Maxwell; retained $13,335.57 in payment of an indebtedness owed to AAC by Maxwell, and retained $100,000 purportedly as escrow agent for Yeamans.

AAC by its complaint filed herein elected to declare all sums due because of Schoenthalers' default and alleged that although it held a note for $238,484.14, it claimed $191,523.17 as the time-price differential on the sale of furniture having a cash price of $180,000 calculated from the date on which the note was executed to the date suit was filed, October 8, 1964, with interest thereafter at the rate of 10 per cent in the amount of $21,812.31 to November 29, 1965.

Likewise, claim was made on the $170,000 note for the principal amount of $170,000 plus interest at 10 per cent from July 10, 1964 (although the note is dated May 26, 1964) amounting to $23,610.

The consideration claimed by AAC for the execution of the $170,000 note by the Schoenthalers was the payment to them of $37,112.58; $100,000 held by AAC as escrow agent for Yeamans; a $5,000 "fee" for decorating and design services (claimed by the Schoenthalers and treated by the trial judge as a fee paid to Maxwell for obtaining the loan from AAC); and $27,887.82 for additional furniture not covered by the $238,484.14 note.

There is no dispute that the two notes of the Schoenthalers were executed and delivered simultaneously and were secured by the same mortgages. They were a part of one over-all transaction between the Schoenthalers and Maxwell; that is, Maxwell would not have loaned the money to the Schoenthalers without the latter's agreement to purchase the furniture from Maxwell, and Schoenthaler would not have purchased the furniture from Maxwell without the latter's commitment to lend Schoenthaler the money.

It is also without dispute that prior to the time AAC advanced any funds in connection with the Schoenthaler transaction, it knew of the form of the notes and was informed of the contents of the agreements of April 28 and May 26, 1964.

**I.**

AAC's primary position, as stated by the District Judge, and as maintained on this appeal, is that there are two separate parts to the transaction: (a) Maxwell sold furniture to the Schoenthalers for

$180,000 cash or a time-price of $238,-484.14 payable in 60 monthly installments, and (b) loaned $170,000 at 10 per cent simple interest repayable in 60 equal monthly installments, provided both would be guaranteed by Yeamans by his placing $100,000 in escrow. Thus, says AAC, the note for $238,484.14 represents the sale of personal property and is not subject to the usury laws, and the note for $170,000 carries interest at 10 per cent per annum and is not usurious.

■ Contrary to AAC's contentions, the District Judge found that the evidence "as a whole leads to the inescapable conclusion that the two notes represent but one loan transaction". The reasoning of the lower court was that Florida law requires examination of the substance of the transaction rather than the mere form to determine usury. Kay v. Amendola, 129 So.2d 170 (2d D.C.A.Fla. 1961). AAC attacks *Amendola* as weak authority for the proposition for which it was cited by the District Court. AAC concludes that this case is "without any supporting authority for the construction placed upon it by the learned District Judge". Assuming without conceding the weakness of *Amendola,* there is other ample Florida authority to support the proposition for which it is cited. Time and again the Florida courts have looked to the substance of a transaction to determine if it was a loan rather than a purported sale. Griffin v. Kelly, 92 So.2d 515 (Fla.1957); Brown v. Home Credit Co., 137 So.2d 887 (2nd D.C.A. Fla.1962), aff'd 148 So.2d 257 (Fla. 1963); Gordon v. West Florida Enterprises of Pensacola, Inc., 177 So.2d 859 (1st D.C.A.Fla.1965). The same approach has been taken by this Court in Conner Air Lines, Inc. v. Aviation Credit Corporation, 5 Cir. 1960, 280 F.2d 895, cert. den. 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225.

In Griffin v. Kelly, supra, the transaction had been disguised as the apparent sale of stock, but the court looked through such a scheme and quoted with approval the following language of the Restatement of Contracts, Section 529:

"Where the intent of a party to a bargain is to make a loan of money or an extension of the maturity of the pecuniary debt for a greater profit than is allowed by law, the agreement is illegal although the transaction is put, in whole or in part, in the form of a sale, a contract to sell or other contract."

The language of *Home Credit* on its appearance in the Florida appellate court is strong support for the same proposition. The following quotations are illustrative:

"In the instant case the lower court in effect found that *Alderman* and *Home Credit,* acting in concert, intended to disguise a usurious loan as a sale of a home improvement. We are not persuaded to disturb that finding."

137 So.2d at 897.

\* \* \* \* \* \*

"The lower court in its decree ruled that the burden of proving fraud had not been met by the defendant, but that the notes and mortgage held by *Home Credit* were drawn in an attempt to circumvent the usury statutes for the reason that *Home Credit* in effect dictated and created the terms of the loan obligation to the original parties in privity with full knowledge that, if the loan had been handled as a normal loan, the amount of interest derived would in fact have been usurious \* \* \*."

137 So.2d at 890.

On certiorari granted by the Florida Supreme Court in *Home Credit* the Florida position of looking to the substance of the transaction was further emphasized at 148 So.2d 258:

"Our examination of the record and facts recited in the opinion of the district court fully sustains its conclusions with respect to the petitioner's position and participation in the transaction from the outset rather than as a third party holder in due course, and we conclude also that the nature of the transaction between the parties was

properly defined as a loan obligation subject to the usury statutes."

After its critical analysis of *Amendola,* AAC implies that there is no other Florida authority allowing a court to pierce the form of a transaction to examine its substance. The preceding authorities amply dispose of such an implication.

■ The next question, and a most critical one, is whether the record does in fact support a finding that the entire transaction was one loan rather than two, separate, lawful transactions. After a thorough examination of the record, we conclude that it does for the reasons enumerated below. Beginning with the stipulation entered into by the parties:

"(3) Pursuant to the terms of the Commitment Letter, Schoenthaler executed and delivered to The Maxwell Company the two notes which form the basis of this law suit. These two notes were executed and delivered simultaneously and were secured by the same mortgages. They are a part of one over-all transaction between Schoenthaler and The Maxwell Company; that is, The Maxwell Company would not have lent the money to Schoenthaler without Schoenthaler's agreement to buy the furniture from The Maxwell Company and Schoenthaler would not have purchased the furniture from The Maxwell Company without The Maxwell Company's commitment to lend him the money."

AAC, as assignee of the notes from Maxwell, now seeks to separate the two transactions in order to save them from the vice of usury. AAC begins its argument with numerous citations indicating that the usury laws do not apply to the sale of personal property. The District Judge recognized, and it has never been argued otherwise than that the usury laws do not apply to such a sale. Mid-State Homes, Inc. v. Staines, 161 So.2d 569 (2d D.C.A.Fla.1964); Davidson et al. v. Davis, 59 Fla. 476, 52 So. 139, 28 L.R.A.,N.S., 102 (1910). The critical issue is not whether the usury laws apply to the sale of personal property, but whether the instant case actually was a sale rather than a loan. Davidson v. Davis, supra, makes it clear that the intent of the parties is determinative as to whether a transaction is a loan rather than a sale. The intent of AAC and Maxwell is revealed at numerous points in the record in addition to the stipulation previously quoted.

The initial distinction made by the parties is that AAC views the purchase of the furniture as the primary phase of the transaction and of utmost importance to Schoenthaler. On the other hand, Schoenthaler emphasizes that it was the financing and working capital that he was interested in and whoever could provide these would obtain the furniture contract.

To determine the loan versus sale question we first look to the testimony of Mr. John M. Lowe, Vice President of Maxwell. When asked to explain his understanding of this entire transaction, he replied:

"A. Well, Mr. Schoenthaler had a motel to furnish and he needed some financing to buy the furniture, to pay off some obligations or whatnot, he needed money, and we agreed to arrange a mortgage for him, to finance the furniture that he wanted to buy and to give him some extra capital by giving us a mortgage as security for the debt. We arranged this with a finance company, and that is the story. We sold him the furniture and gave him the money.

Q. Who was the finance company?

A. American Acceptance Corporation.

Q. You say you arranged it with the finance company. What do you mean by that?

A. We arranged that they would handle the paper for us, be back of us. We arranged to give him the mortgage—I mean that would have no bearing on it.

Q. You mean you set up the financing?

A. Oh, yes. We set it up for it. They weren't concerned with American Acceptance or anybody else. We set up the financing.

Q. How much was involved?

A. $350,000."

When asked how Maxwell arrived at the $170,000 figure for the loan, Mr. Lowe stated: "We didn't pick the figure. He [Schoenthaler] said he needed $350,-000; $180,000 to buy the furniture with and $170,000 worth of financing."

The Maxwell Company became aware that it would be able to sell the furniture and fixtures to the Schoenthalers if the Maxwell Company also provided the necessary secondary financing required by the Schoenthalers. Accordingly, the Maxwell Company made arrangements for the secondary financing with AAC, the terms and conditions of which were required to be approved and accepted by AAC before the matter could be consummated.

Defendant Schoenthaler testified that the original plans called for a loan from Union Pension Fund for $1,750,000 in return for a first mortgage. Subsequently, the Union had a change of mind and would only agree to a loan of $1,350,-000. This reduction in the loan from the Union necessitated the search for secondary financing in the amount of $500,000, initially. With the circumstances thus, Schoenthaler was then contacted by Mr. Allan Greenfield, representing Maxwell, who told Schoenthaler, "I think our home office in Miami might be able to help you, and I will get in touch with them". At this time Schoenthaler had never heard of the Maxwell Company. Within a week Mr. Irving Greenfield, President of Maxwell Company, called Schoenthaler seeking additional information about the type hotel that was planned to be built. He also stated that he had people in mind to provide the secondary financing. Thereafter, Mr. Greenfield told Schoenthaler

that $350,000 was the best financing he had been able to arrange.

Schoenthaler further explained that the proceeds of the $350,000 were to be applied $180,000 for furniture, $119,500 to pay off the Yeamans mortgage and $50,000 operating capital. Schoenthaler also added that "at this stage we were fairly desperate" and he had no alternative but to accept the proposal of Maxwell.

George E. Carroll, defendant Schoenthaler's attorney, testified that Schoenthaler had sought secondary financing from hundreds of others before being contacted by Maxwell. In response to the question of whether the transaction with Maxwell was one deal or two separate transactions, Carroll answered:

"A. Well, the terms of the letter speak for itself. We negotiated one deal. That's how it came out.

Q. The purchase of the furniture was to depend on making the loan of cash in addition to that, was it not?

A. Well, look at it this way. We only had furniture on credit.

Q. You wouldn't have bought the furniture unless he loaned the money?

A. We wouldn't buy the furniture unless they loaned us some money. So that's basically how the loan came up. If we didn't get the money, we wouldn't have been there."

To further show the loan characteristics of the entire transaction, the District Court made the following observations in its findings of fact:

"The actual cash price for the furniture sold to the Schoenthalers was $212,887.22, and it is impossible to determine what furniture was sold and included in the $238,484.14 note and that which was included in the $170,-000 note. The cash price of $180,000 was established in the $228,484.14 [$238,484.14] note and the balance of the cost of additional furniture of $27,-

884.82 was charged against the $170,-000 note with a balance of $37,112.58 paid to the Schoenthalers.

"There was thus actually but a single transaction involving a lump sum of money of $350,000 with a reservation of interest in one note of $58,484.14. The two notes are irrevocably tied together since, as previously pointed out, the sum of $7,612.50 is to be paid monthly on both notes and that amount is first to be credited on the interest accruing on the $170,000 note, with the balance being credited against the note for $238,484.14 until the latter was satisfied before there could be any reduction on the principal of the $170,000 note." (R. 1086)

Our study of the record discloses no inaccuracy in the above findings, and we concur in the conclusion reached by the District Court that the two notes represent but one loan transaction.

## II.

Two contentions raised by appellants will be discussed under this section: (1) whether the loan was actually funded for the full $350,000, or for only $250,000, and (2) whether there was sufficient proof of the intent to exact usury, as required by the Florida Statutes.

AAC required a guaranty from Dr. Yeamans of $100,000 and the guaranty of Congress International Inns, Inc., under which name the motel was to be operated, in the amount of $150,000 before it would provide the financing sought by Schoenthaler. From the $170,000 loan to the Schoenthalers, $119,500 was to be paid to Dr. Yeamans who, in turn, was to place $100,000 in escrow as his guaranty of the Schoenthaler obligation. The terms of the Guaranty Escrow Agreement pertaining to the above arrangement read as follows:

"To secure the guaranty of the said Dr. Willis H. Yeamans, there is to be deposited in a bank to be selected by yourselves and the undersigned the sum of $100,000, same to be held in escrow by said bank for security for the performance by the said Dr. Willis

H. Yeamans of the terms of said guaranty."

What actually happened was that it was subsequently decided by AAC that it would just hold the $100,000, and, in fact, it never parted with that amount. The following facts are clear in the record: (1) Yeamans never had the $100,000, and (2) AAC never obtained Yeamans' permission for it to hold the $100,000 rather than to deposit the $100,000 in a bank at the direction of Yeamans as provided in the Guaranty Escrow Agreement.

There are repeated references in the Guaranty Escrow Agreement to the effect that a "bank" was to hold the $100,-000. AAC is a finance company. Under even the loosest of language, it is not a bank.

The position of AAC is that it had no interest in who held the $100,000, and that it ended up holding the $100,000, by agreement of the parties. AAC argues that its holding the $100,000 is no different from its paying the $100,000 directly to Yeamans, with, in turn, a redeposit of the money with AAC as escrow agent. The obvious answer is that if the money had been paid to Yeamans as called for in the stipulation, Yeamans would have made the deposit in a bank and not with AAC. Yeamans never consented to any alteration of the Guaranty Escrow Agreement. It was only *after* the closing of transaction that Yeamans was informed that AAC was to hold the money. The only consent AAC ever obtained to hold the money was from Mr. Carroll, attorney for Schoenthaler. The transaction was closed over the objection of Yeamans.

Yeamans also observes that the $100,-000 retained by AAC was never set aside into any type of escrow account. Mr. Alkins, Comptroller of AAC, testified that the $100,000 remained in the general funds of AAC and was noted on the books as a liability to Maxwell.

We conclude that the loan was funded only in the amount of $250,000, rather than $350,000. Therefore, the

interest rate computations of the District Court were properly made with reference to $250,000, the amount actually disbursed. The rule is abundantly clear under the Florida decisions that interest may not be charged on portions of the principal not disbursed or retained (either or both) as security for the loan. Mindlin v. Davis, 74 So.2d 789 (Fla. 1954); Williamson v. Clark, 120 So.2d 637 (2nd D.C.A.Fla.1960); Coral Gables First National Bank v. Constructors of Florida, Inc., 119 So.2d 741 (3rd D.C.A. Fla.1960). The $100,000 in question clearly was retained by AAC. It was not retained at the direction of Yeamans, nor was it deposited in escrow as called for by the Guaranty Escrow Agreement.

AAC also argues that there is insufficient evidence to support the requirement of the Florida Statutes that the excessive interest be "willfully and knowingly" charged by the lender.[2]

■ The proof of willfulness necessarily involves determination of the subjective state of the mind of the lender. Travers v. Tilton, 134 So.2d 807 (2d D.C.Fla.1961). The Florida Supreme Court observed in Shorr v. Skafte, 90 So.2d 604, 607 (Fla.1956), that "a man's actions are indicia of his intentions". Continuing further, the Court added:

"The ignorance of the borrower is of small consequence; the important factor is the willfulness of the lender. *And the matter of willfulness is not absolutely closed by the bare statement of the lender that he was unconscious of wrongdoing.* If such were the law the prohibition would amount to nothing. The circumstances must be taken into account * * *." (Emphasis added)

■ Other Florida decisions have emphasized the necessity of clearly showing the intent to evade the usury laws. In-

dian Lake Estates, Inc. v. Special Investments, Inc., 154 So.2d 883 (2d D.C.A. Fla.1963). Such cases are, of course, relied on by AAC, but a closer examination of them reveals that the only evidence of intent to charge usurious rates "has been the intent to exercise the option to accelerate upon default",[3] as was done in the instant case.

■ We conclude there is sufficient evidence in the present record to support a finding of "willfully and knowingly" charging the excessive interest. In addition, AAC stipulated as a fact the following:

"American Acceptance Corporation, however, concedes that if the $238,484.14 mortgage note came into existence by reason of a 'loan' transaction rather than a 'purchase and sale' transaction, the provisions of the Florida Statutes relating to usury have been violated by The Maxwell Company."

The foregoing stipulation and Florida decisions foreclose AAC's contention that "intent" is not shown by the proof.

### III.

■ The next contention of AAC is that Florida Statute 687.07, F.S.A. could not apply to the present facts. At the outset we note that no payments were ever made on the obligation in question. AAC employs a comparison of Florida Statutes 687.03, 687.04 and 687.07 to reach the conclusion that 687.07 could not apply to the present situation. An analysis of the preceding provisions reveals that 687.03 contains the general definition of civil usury, i. e. "to reserve, charge or take for any loan * * * a rate of interest greater than ten per cent per annum". It is necessary to look to 687.04 for the penalty provisions of 687.03. Section 687.04 provides for a forfeiture of "the entire interest so

---

2. Fla.Stat. Sec. 687.07 (1965), F.S.A. See Footnote 1.

3. Hardaway, Debtor-Creditor Conflict Over Acceleration, 17 U.Fla.L.Rev. 163, 186 (1964); See also, 11 U.Fla.L.Rev. 384 (1958), where it is noted that the Flori-

da cases do not require an intent to violate the statute, but only an intent to charge the rate provided in the transaction. To the same effect is Boyer, Usury and the Viruliferous Acceleration Clause in Florida, 21 U. Miami L.Rev. 215, 231 (1966).

charged, or contracted to be charged or reserved", but allows collection of the principal sum if the interest exceeds 10 per cent per annum. However, if the "usurious interest is taken or reserved, or has been paid", 687.04 orders a forfeiture of double the amount so paid. Thus, in civil usury cases, the Florida legislature has distinguished between merely charging or contracting to charge or reserve interest on the one hand, and the actual taking, reservation or paying of the interest on the other. The penalty for the latter is *double* forfeiture of the interest.

Proceeding to 687.07, we observe that the prohibited rate of interest is that in excess of 25 per cent per annum, and the fact that violation of this section is defined as a misdemeanor has led to the common reference to 687.07 as the "criminal usury" statute. Section 687.-07 contains both the prohibitions and the penalties, unlike the dichotomy of 687.03 and 687.04, the civil usury statutes. The activity prohibited in 687.07 is to "charge or accept" interest exceeding 25 per cent per annum. The penalties provided are the forfeiture of principal and interest plus the misdemeanor violation previously mentioned.

AAC insists that there is a meaningful distinction to be found in the legislature's use of "charged or contracted to be charged" in 687.04, and the phrase "charge or accept" in 687.07. The conclusion of AAC is "that in Chapter 687.-07 the only construction consistent with the legislative intent has to be that "charged, as expressed in Chapter 687.04, means that the person lending the money actually did receive it through payment". Apparently, such a conclusion is based on the reasoning that "charge" in 687.07 means that payment is actually made by virtue of the fact that "charge" was not used in conjunction with "contracted to be charged" as it was in 687.04.

Such a conclusion is strained to say the least. Section 687.04 makes a distinction

between instances where the interest is "charged, or contracted to be charged", in which case the interest is forfeited, and those instances in which the interest "is taken or reserved, or has been paid", in which case the forfeiture is double. Thus, it is apparent that different penalties were provided for the two different situations in 687.04.

▇ No such distinction was made in 687.07. We conclude that the only reasonable interpretation of 687.07 is that both the interest and principal are to be forfeited if the interest exceeds 25 per cent per annum, without regard to the actual collection of the interest.[4] Clearly, the ordinary meaning of "charge" is not sufficiently broad to contemplate the requirement of actual payment.

The Florida Courts have had numerous opportunities to construe this point in the usury statutes. In Brown v. Home Credit Co., 148 So.2d 257 (Fla.1963), the Florida Supreme Court found criminal usury in a situation in which the borrower signed notes in the face amount of $8,750.00. The amount advanced to the borrower was only $5,000.00. Default occurred after only one payment had been made, and yet the Court ordered forfeiture of principal and interest despite the fact that the one payment made represented only 1/120 of the total obligation.

First Mortgage Corp. of Vero Beach v. Stellmon, 170 So.2d 302 (2d D.C.A. Fla.1964), cert. den. 174 So.2d 32 (Fla. 1965), involved the double forfeiture portion of 687.04 which requires that the interest be "taken or reserved or has been paid". The facts were that the borrower signed a note for $20,320, with $12,840.60 being advanced by the lender. Had the note run to maturity, the interest would have been less than 10 per cent per annum. However, the note contained an acceleration clause, and on default of a few installments suit was brought by the lender for the total amount. The interest was then

4. Webster's New International Dictionary defines charge as: "To make a charge; to demand or set a price; to make a debit; as, to *charge* high for goods.

computed for the period of time from the inception of the contract to the date of the final decree. This computation revealed an interest rate in excess of 10 per cent and the Court ordered double forfeiture. The Court also noted that the loan was criminally usurious but the application of the double forfeiture provision of 687.04 had extinguished both principal and interest and made application of 687.07 unnecessary.

■ The net effect of *Home Credit* and *First Mortgage* is to hold that the addition of principal and interest in the note is enough of a "taking" or "charging" to warrant application of either the double forfeiture provision of 687.04 if the interest exceeds 10 per cent, or the forfeiture of both principal and interest under 687.07 if the interest exceeds 25 per cent.[5]

■ The District Court was correct in its application of 687.07 to the present situation, and in ordering that AAC forfeit both principal and interest.

## IV.

AAC makes the further contention that it is a bona fide transferee of the notes, and that under these circumstances the defense of usury is not applicable to it. To this the appellees have three answers: (1) AAC participated in the entire transaction to such an extent that it would not be considered a bona fide purchaser without notice or a holder in due course; (2) each note is burdened with the terms and conditions of the other, thus making them non-negotiable; and (3) the statute applicable to this action is Florida Statutes 687.07, F.S.A. the criminal usury statute, rather than the civil usury statute, Florida Statutes 687.04, F.S.A., relied on by AAC in its asserted defense. The protective clause

of being a "bona fide endorsee or transferee of negotiable paper", appearing in Florida Statutes 687.04, F.S.A., does not appear in 687.07; therefore, the conclusion urged by the appellees is that the Florida legislature did not intend for such a defense to be interposed in a situation involving application of 687.-07, the so-called "criminal usury" statute.

■ We deal first with the contention of appellees that AAC participated in the entire transaction, noting their argument that AAC participated in and dominated the terms and conditions of the transaction in much the same way as was done in Brown v. Home Credit Co., 137 S.2d 887 (2d D.C.A.Fla.1962) aff'd 148 So.2d 257 (Fla.1962). The present record contains ample evidence supporting such a contention. Indeed, the record is not susceptible of any other construction.

Mr. Aaron Kanner was the attorney who represented Maxwell in the Schoenthaler transaction. Mr. Kanner first learned of the proposed deal while in Chicago with Mr. Greenfield, President of Maxwell, in March of 1964. It was discussed and understood at that time that Schoenthaler needed some financing, and that whoever could get the financing for him would also get the furniture contract. Mr. Kanner also testified that it was generally known that Schoenthaler's attempts to get such a loan had been turned down everywhere. AAC then entered the picture as the source of the additional financing and from that time forward the terms and conditions of the commitment letter of April 28, 1964, were programmed around the desires of AAC. Mr. Kanner stated in his deposition that AAC "wasn't too happy" with the idea of Congress International executing a guaranty of only $100,000,

5. Accord: Gordon v. West Florida Enterprises of Pensacola, Inc., 177 So.2d 859 (1st D.C.A.Fla.1965); Boyer, Usury and the Viruliferous Acceleration Clause in Florida, 21 U. Miami L.Rev. 235–237 (1966).

We are mindful of our decision in Conner Air Lines, Inc. v. Aviation Credit Corporation, 5 Cir. 1960, 280 F.2d 895,

cert. den. 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225, wherein the *opposite construction* was placed on the Florida usury statutes. However, the more recent Florida decisions just discussed place a *different interpretation on these statutes*. *Erie* requires us to follow the Florida decisions.

and thereafter Congress agreed to go to $150,000. Mr. Kanner further testified that "all the previous conferences in relation to the commitment were predicated on the basis that we [Maxwell] would find somebody to take the paper from us; that if we didn't find somebody to take the paper from us, there would be no deal. They understood that".

When asked specifically whether the commitment letter was drafted to satisfy AAC, Mr. Kanner replied: "That is it exactly".

If additional evidence is needed showing AAC's participation, it can be found in the pretrial stipulation:

"(7) American Acceptance Corporation admits that prior to the time it advanced any funds in connection with the Schoenthaler transaction, it knew of the form of the notes and was also informed with respect to the contents of the April 28, 1964 Commitment Letter and the Guaranty Escrow Agreement dated May 26, 1964."

As early as March of 1964, Mr. Greenfield told defendant Schoenthaler that AAC was to be the source of additional finances.

■ For AAC now to argue that it is a "bona fide endorsee or transferee" of the notes in question pursuant to Florida Statutes 687.07, F.S.A., is directly contra to its admitted awareness of the transaction as evidenced by the stipulation. The other evidence, particularly the testimony of Mr. Kanner, amply supports a finding that AAC was not a bona fide transferee, but negotiated with Maxwell from the outset concerning the secondary financing.

We therefore conclude that the record is entirely inconsistent with the argument of AAC. It is impermissible for AAC to have participated in this transaction to such extent that the actual terms were established by AAC, and at the same time acquire for itself the status of "bona fide endorsee or transferee". Our holding on this point adequately disposes of AAC's defense and makes unnecessary a resolution of the

remaining contentions of Schoenthaler: whether the notes were in fact negotiable and also whether the defense of bona fide endorsee or transferee is available in an action for criminal usury.

V.

We have now concluded that the loan was funded for only $250,000 and that the interest computations were correctly made with reference to that amount. AAC now injects the additional contention that it is logically inconsistent to hold on the one hand that $100,000 was never advanced, and then order that judgment be entered for Dr. Yeamans for the same $100,000. The gist of the argument is that the $100,000 never became the property of Dr. Yeamans and cannot now be recovered by him. Pertinent to this contention is the stipulation of the parties reading: "It is stipulated and agreed that the sum of $100,000 being held by American Acceptance Corporation is the property of Dr. Yeamans."

The fact that a loan has been funded for $250,000 ($100,000 less than the amount contracted for) is determinative of the sum on which interest may legally be charged, but such fact is not dispositive of the ultimate recipient of the principal if the principal is to be forfeited by virtue of the usurious nature of the entire transaction.

■ We note that the counterclaim of Dr. Yeamans seeks the $100,000 by virtue of an alleged material alteration of the guaranty agreement, i. e., the $100,000 was never deposited with a bank as escrow agent as provided in the guaranty agreement. However, after deciding that the principal and interest were to be forfeited, the District Court concluded:

"* * * [I]t is unnecessary to consider or decide whether the guaranty is a general or special one or whether there were material alterations or breaches of it as alleged by the counterclaimant. Defendant Yeamans, as counterclaimant, is entitled to the return of the sum of $100,000 from

the plaintiff together with interest and costs."

It was obviously the conclusion of the District Court that the $100,000 was part of the principal amount of the loan, although the loan was never funded with that amount so as to make interest computations allowable thereon. The fact that the loan was never funded with the $100,000 does not mean that that amount would not be forfeitable under 687.07. The $100,000 had to be either principal or interest. Whichever it was, it is forfeitable if the entire transaction is found to be criminally usurious.

We have examined and considered all other points raised by AAC and find them to be without merit. The judgment of the District Court is affirmed.

## ON PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the Petition for Rehearing En Banc is denied.